**Truly Mae TAYLOR, et al., Plaintiffs,**

v.

**HAYWOOD COUNTY, TENNESSEE et al., Defendants.**

**Civ. A. No. 82–1138.**

United States District Court,
W. D. Tennessee, E. D.

Aug. 3, 1982.

---

Thomas M. Daniel, Robert Bruce McDuff, Memphis, Tenn., Nathan B. Pride, Gary Vanasek, Jackson, Tenn., for plaintiffs.

Lyle Reid, Brownsville, Tenn., Ernest Kelly, Jr., Memphis, Tenn., for defendants.

ORDER GRANTING PRELIMINARY INJUNCTION

HORTON, District Judge.

This lawsuit arose out of dissatisfaction by the plaintiffs with a Private Act of the Tennessee General Assembly restructuring the method for election of Board of Highway Commissioners in Haywood County, Tennessee. That Private Act changes the election of Highway Commissioners from district elections to countywide at-large elections. Plaintiffs contend countywide at-large elections racially discriminate against black voters in Haywood County in that black voting strength is greatly diluted in comparison to white voters, thereby denying black voters equal protection under the law. Plaintiffs allege that the new at-large elections violate the Fourteenth and Fifteenth Amendments to the Constitution of the United States, as well as the Voting Rights Act of 1965, as amended.

Plaintiffs, black citizens of Haywood County, Tennessee, seek a preliminary injunction enjoining the defendants from conducting countywide at-large elections on August 5, 1982, for the positions of Highway Commissioners in that County.

According to the evidence presented in this case, during extensive hearings, Highway Commissioners have been elected by district in Haywood County since 1937. In 1981, the Honorable Dixon Hood, Haywood County Judge, decided that Haywood County should be reapportioned based upon the 1980 census. Judge Hood recommended to the Haywood County Commission that it appoint a Reapportionment Committee to devise and recommend to that body a plan for the reapportionment of Haywood County. The committee, consisting of five members, four white and one black, was appointed in 1981.

Judge Hood and the Haywood County Commission requested technical assistance from the State of Tennessee. That technical assistance was provided by the State of Tennessee's Planning Office. Mr. Mike Malone, a planner, was assigned the task.

Mr. Malone and the Reapportionment Committee had several meetings in which reapportionment was discussed and plans were developed to reapportion the Haywood County Commission. Following a public hearing, a plan of reapportionment was recommended to the Haywood County Commission, and subsequently approved by that body.

The Reapportionment Committee was thereafter reappointed to study reapportionment of the Road Commission and the Board of Education. That committee voted

unanimously to recommend to the Haywood County Commission that the Board of Highway Commission positions be filled by an election on a countywide at-large basis. The Haywood County Commission then passed a resolution asking the State Senator and State Representative for Haywood County to introduce for passage by the Tennessee General Assembly a private act providing for countywide at-large election of Highway Commissioners. This private act was passed by the General Assembly and subsequently approved by the Haywood County Commission. The first phase of the at-large election of the Road Commissioners is scheduled to take place in the August 5, 1982 elections. It is in this above posture that plaintiffs have filed their motion for an injunction enjoining the Road Commissioner elections.

The Court must determine whether there exists a substantial likelihood that countywide at-large elections for Highway Commissioners in Haywood County, Tennessee, on August 5, 1982, will violate plaintiffs' constitutional rights as alleged, and, whether, in the circumstances of this case, a Preliminary Injunction enjoining the election would be proper. The Court finds, from all of the proof in this entire record, that countywide at-large elections for the Board of Highway Commissioners in Haywood County, Tennessee, show a substantial likelihood of violating the constitutional rights of plaintiffs. The Court finds, from the proof in the record, that the change from district elections to countywide at-large elections for Highway Commissioners appears to be racially motivated and threatens to substantially result in an unconstitutional dilution of plaintiffs voting rights in violation of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States and in violation of the Voting Rights Act of 1965, as amended. Therefore, for those compelling reasons, the Court will issue a preliminary injunction enjoining the defendants from conducting elections to fill the position of Highway Commissioner under the reapportionment plan approved by both the Tennessee General Assembly and the Haywood County Commission for Haywood County pending further hearings on the merits of this lawsuit.

While Haywood County, Tennessee, has made substantial and commendable progress in race relations in the past few years, the testimony in this case shows that the County has a history of hostile acts, inhumane treatment and deplorable examples of racial discrimination against black citizens.

*Dr. Currie Porter Boyd,* Ph.D., a citizen of Haywood County and professor at Jackson State Community College, Jackson, Tennessee, testified that he first attempted to register to vote in Haywood County in 1958. After attempting to register to vote, he was fired, without explanation, from his job as principal of an elementary school in Haywood County. He testified that those blacks who did attempt to register to vote in 1960 were put off of farms by landowners and were personally threatened and jailed. Those blacks could not purchase basic supplies and provisions on which to live. The result was establishment of what became widely known throughout the nation as Tent City to house socially and economically displaced black citizens. Ultimately, the United States Department of Justice filed a lawsuit against landowners and businesses. The case is styled *United States v. Beaty,* 288 F.2d 653 (6th Cir. 1961).

During early attempts by black citizens to register to vote, Dr. Boyd stated it took all afternoon to get as many as four (4) people registered to vote. When elections were held after black voters registered, the voting precincts closed at 5:00 p. m., rather than at 7:00 p. m., which had been the normal closing time for voting precincts.

Dr. Boyd testified that he does not know of any black citizen who has ever been elected to a countywide at-large office in Haywood County. He testified that it is a disadvantage to a black candidate to run at-large in a Haywood County election because:

1) A black candidate could not know all of the people in the county;

2) It is far more expensive for a black candidate to cover an entire county;

3) It is difficult for a black candidate to go among unfamiliar faces;

4) A black candidate does not have access to the financial resources necessary to conduct an at-large election campaign in Haywood County, which, he said, is a very large county;

5) At-large elections make it much less likely that a black candidate will be elected;

6) At-large elections very much discourage black voters because they will not feel they have an opportunity to elect black candidates to public office.

Dr. Boyd expressed the view that generally black people in Haywood County, Tennessee, oppose the at-large method of elections. "I see race all through it," he said. Dr. Boyd did admit that race relations have improved in Haywood County since the year 1960.

*Dr. Morgan Kousser,* a historian and teacher of History, Political Science and Econometrics at the California Institute of Technology, Pasadena, California, testified for the plaintiffs. Dr. Kousser testified that he was born in Lewisburg, Tennessee, and grew up in Nashville, Tennessee. He said his senior thesis at Princeton University was entitled Tennessee Politics and the Negro, 1948 to 1964. He earned his Ph.D. degree in history at Yale University in the area of Southern History and Political Science. His dissertation advisor was Dr. C. Van Woodward, an expert in Southern History. His Ph.D. dissertation is entitled "The Shaping of Southern Politics, Suffrage Restriction and the Establishment of the One Party South, 1880 to 1910." He said that his research is focused on southern history and the history of racial discrimination. He has researched and studied the history of racial discrimination in Haywood County, Tennessee. That research included the 1955 and 1961 Civil Rights Commission Reports, newspaper clippings from the *Nashville Tennessean, The Nashville Banner, The Memphis Commercial Appeal* and *The States Graphic,* a newspaper published in Brownsville, Tennessee. Dr. Kousser testified to the following facts:

1) There was very considerable racial discrimination in Haywood County in the late 1950's and early 1960's.

2) In the 1880's and the 1890's there were some black registered voters in Haywood County. Immediately prior to 1960, there were no black registered voters in that county.

3) The first black citizens to register to vote in Haywood County in modern times was on May 17, 1960. It made the *New York Times* when eight blacks registered to vote in 1960.

4) The response of the white community to black voter registration was a significant amount of economic intimidation—throwing sharecroppers off their farms, the denial of credit, a conspiracy on the part of a large number of landowners, banks, etc. and resulted in a lawsuit styled *United States v. Beaty,* 288 F.2d 653 (6th Cir. 1961).

5) The first black citizen to run for public office in Haywood County was Mr. Odell Sanders. He ran for the position of alderman for the City of Brownsville, Tennessee, in 1964. Mr. Sanders lost the election.

6) The first successful black candidates were Messrs. Powell and Nixon who won a magistrate's district election in District 9 of Haywood County.

7) In Haywood County, racial discrimination was pervasive in the 1960's. There was a freedom of choice plan in existence in the public schools and in the 1966–67 school year approximately one percent of black students attended what were then referred to as the white schools.

8) Blacks were very prominent in Haywood County politics from 1870 to 1888. Samuel McElwaite, a black, was elected to the State House of Representatives in 1883. In 1885, he was nominated by the Republican Party for Speaker of the House of Representatives of the State of Tennessee. However, that political era ended in 1888 when there was a violent overthrow of the Republican Party in Haywood County by a

Klan-like group called the Haywood Guards. Thus, through violence and intimidation black political power was brought to a substantial end in Haywood County, Tennessee, in 1888. Thereafter, representatives from Haywood, Fayette, Shelby and other counties obtained legislation, from the Tennessee State Legislature, effectively ending black political participation in West Tennessee. Those laws were a Poll Tax Act, Secret Ballot Law and a Registration Law. Those laws were clearly racially discriminatory in their purpose and intent.

9) As late as the 1962–63 school year, Haywood County was spending 75 cents for each black student's education compared with each dollar spent on each white pupil.

10) A racial bloc voting analysis in countywide elections in Haywood County shows that black candidates running in six elections against white candidates did not receive more than eight percent of the white vote.

a) In the 1974 election a black candidate named Hudson running for Circuit Court Clerk received 8 percent of the white vote and 60 percent of the black vote.

b) In four other 1974 countywide races, one black candidate received 10 percent of the white vote and 56 percent of the black vote, another candidate received 0 percent of the white vote and 34 percent of the black vote, another black candidate received 10 percent of the white vote and 75 percent of the black vote. In the fourth race, a black candidate for Road Commissioner received 6 percent of the white vote and 48 percent of the black vote.

c) In a 1978 countywide race for Register, one black candidate received 0 percent of the white vote and 63 percent of the black vote.

d) In 1982 a black candidate won a citywide election for alderman in the City of Brownsville, Tennessee. He received 3 percent of the white vote and 85 percent of the black vote.

The testimony in this record shows that 8 black candidates had run previously in countywide elections—and all were defeated. The most recent such election was for the position of County Register in 1978.

Dr. Kousser gave the following graphic and highly credible testimony which the Court incorporates in this opinion without further comment. It speaks for itself:

Q. (By Mr. McDuff) Dr. Kousser, what does your racial block voting analysis tell you about the impact of at-large elections on black voters in Haywood County?

A. At-large elections have a disproportionately discriminatory impact on black voters in Haywood County. They have much less chance to win than under the single district system.

THE WITNESS: The answer was that in countywide elections, blacks have been notably unsuccessful in Haywood County. They have never gotten more than 27.3 percent of the vote. They have faced racial bloc voting by whites, and it has been overwhelming. In that sort of environment, with pervasive racism in the white electorate as indicated by the racial bloc voting analysis, blacks are disproportionately discriminated against and disproportionately impacted by a countywide election, by an at-large election rather than a district election.

Q. (By Mr. McDuff) Dr. Kousser, do you know what the percentage black voting age population is compared to the total voting age population?

A. For the county as a whole we do have figures from the 1980 election. I believe it is about 47 percent—about 51.2 percent in the population as a whole.

Q. Does a white candidate or white officeholder, in light of what you have just testified to about racial bloc voting, have to be responsive to the interests of black voters because black voters compose 47 percent of the voting age population?

A. I would think not. That conclusion is based upon not only the fact that there is very considerable racial bloc voting during

the elections where any black is a candidate at least—it is also based on the fact that blacks are or were in 1972, and probably still are—Haywood County is like other counties where we do have some voting registration totals by race since 1972—probably still are disproportionately unlikely to participate in politics. 51 percent of the population and 47 percent in voting age population, but probably a smaller proportion registered.

Q. It is likely that blacks will participate proportionately less in politics?

Do you consider that to be the result of historical discrimination?

A. Yes; and current poverty.

Q. Dr. Kousser, is it more difficult for black candidates, compared to white candidates, to participate in the citywide elections or countywide elections in Haywood County?

A. It is much more difficult to participate in countywide elections for blacks.

Q. Why is that?

A. They are poor. The area is large. It is extremely large. In order to campaign in such an area, you have to have gas to get around. You have to have posters all over. You have to have people to get your people to the polls in all areas of the county. You have to be extremely well organized. You have to have visibility. To have visibility, it helps to have the media. As has been shown previously, the leading newspaper of the county is not exactly sympathetic to black concerns. It is very difficult for them to get what could be called good publicity, I am sure, in that media. It is very difficult for them to get known. Because of historic and continuing discrimination in general throughout the south, it is more difficult for a black politician to get to meet other politicians and influential people. Blacks have not been permitted to join local civic clubs, and things like that, in which they are able to meet—in which politicians typically are able to meet other politicians and people who can help them in their campaign. For blacks it is very difficult to run in a countywide election.

Q. What kind of effect do at-large elections generally have on black political candidacy?

A. They discourage black political candidacy because blacks realize that they will not have as good a chance of winning as they would under a single member district system.

Q. Suppose that a black candidate won an election against two white opponents with a plurality of the vote. What kind of candidate line-up would you expect to see at the next election?

A. I would expect to see a one on one, white versus black race, or at least one viable, overwhelming white candidate to run against the black incumbent or the black running in that race.

Q. Do you know of instances in other communities where that has happened?

A. Yes, I do. I believe it happened recently in West Helena, Arkansas, which was the subject of a Federal Court case earlier this spring, in which in a first election, at least in an initial election, black candidates were victorious against multiple white candidates, multiple viable white candidates. When they tried for reelection there was only one viable white candiate against them, and the black candidates lost.

Q. And that case is *Perkins v. City of West Helena*, 675 F.2d, 201 (8th Cir.)?

A. Yes. I read that case.

Q. Can you tell us what the opinion is based on, please?

A. Yes, I can.

In the first place, it is based on the whole history of racial discrimination and racial bloc voting in Haywood County, That has a long history. It dates at least from the 1860's and '70's, and it is not an attitude or set of attitudes among whites that I expect to evaporate overnight. It has existed, according to my racial bloc voting analysis, through June of 1982, and continues to exist.

Secondly, it is based upon analysis of the sequence of events which occurred. Let me go over those quickly. One, in 1978 for the

first time since the Haywood County Commission, since the Haywood County Road Commission was set up in 1937, there was a black elected to that commission—the first black elected. At the next opportunity they go to at-large. They never had at-large before. They had district systems.

Q. Do you know how long the district system had been in existence?

A. They had had district systems, I believe, since 1937.

Q. Please continue.

A. The second thing is the emergence of a Civil Rights group, which focused its attention on roads, on roads for blacks. That, so far as I know, had never been a focus of substantial activity and never been sort of Publicly identified as a racial issue.

Q. When did this emergence occur?

A. It occurred in 1980. I believe that the first records that I have seen in the newspaper came in 1980 when the organization called JONAH began to ask for particular consideration to be given to roads in the black community.

Q. Did this movement accelerate in 1981?

A. Yes, it did. There were a series of public hearings detailed in the newspapers, in which JONAH asked for money to be spent on roads in black communities.

Q. Dr. Kousser, what was the response from your research of the black community to the proposed change through at-large elections for the Road Commission?

A. The response detailed in the newspapers was that they were overwhelmingly against the change. There was a whole crowd of people from JONAH at the ultimate meeting which the Board of County Commissioners had to vote to institute the change. They seemed extremely displeased at the ultimate outcome, and after having presented evidence and agitated, they walked out when they lost.

Q. Was that being held on April 18th, 1982?

A. I believe that is the date—around then at least.

Q. From your research, do you know or can you express an opinion on whether or not the officials of the Haywood County Commission knew of the black opposition to the at-large election system for the Road Commission?

A. Yes, I can. I have before me part of Exhibit Number 16 from the *Jackson Sun*, in February, 1982. The title of the article is, "Haywood Group questions voting plan." There were several articles which indicated that the black opposition to the at-large voting had been made quite clear to the officials who had to vote on the issue.

In the Spring of 1981, following the release of 1980 census figures, the *Honorable Judge Dixon Hood*, County Judge of Haywood County, testified that he was informed by the Tennessee State Planning Commission and other sources, of the county's need to reapportion the County Commission based upon the new census figures. The results of the 1980 census indicated that the county's population was continuing its movement from rural areas of the county to areas within the city of Brownsville, Tennessee. According to the figures, fully 46% to 47% of the county's population was within the boundaries of the city of Brownsville.

Judge Hood acting on that information, informed the Haywood County Commission of the county's need to develop a reapportionment plan and suggested that the commission form a committee to develop such a plan. The county commission responded by giving Judge Hood authority to appoint a Reapportionment Planning Committee (hereinafter committee). Pursuant to that authority Judge Hood selected five persons whom he knew well and were personal friends to serve on the committee. Thinking the committee would need technical assistance, Judge Hood contacted the State Planning Office at Jackson, in neighboring Madison County, Tennessee. It was decided that Mike Malone, of the Jackson office of the State Planning Commission, would assist Judge Hood and the committee in the formulation of a new reapportionment plan.

Mr. Malone, a graduate of Lambuth College, with a bachelor's degree in business administration, had been employed as a planner by the Tennessee Planning Commission for 13 years. As a state planner, Mr. Malone indicated that part of his duties included assisting cities and counties with matters such as land use planning, zoning, subdivision control and reapportionment. Malone testified that he had worked with Judge Hood and other Haywood County officials on two previous occasions. Initially, he had provided assistance in regard to subdivision regulation. Later he helped the county qualify for participation in the National Flood Insurance Program.

Prior to the committee's first meeting, Malone provided members of the committee with brochures and other introductory materials explaining reapportionment. He also provided members of the committee with statistics from the 1980 census. Judge Hood attended that meeting and testified the committee generally discussed objectives to be accomplished by the new reapportionment plan. According to Judge Hood the committee decided the new plan should:

1) Maintain the present number of commission seats, which was at that time (20) twenty.

2) Continue to elect 2 commissioners from each district.

3) Attempt to follow district boundary lines then in effect, or in the alternative, follow enumerated district lines or natural boundaries such as roads, rivers, or property lines; and

4) Maintain a deviation from one man one vote rules of not more than plus or minus five (5%) percent.

The Committee then requested that Malone draft a reapportionment plan encompassing those various characteristics. Malone was also advised of two factors the committee considered as presenting problems in the drafting of a viable reapportionment plan. First, 47% of the county's population, a near majority, was encompassed within the city of Brownsville, Tennessee. Second, that not many people live south of

the Hatchie River, and that those persons who did live south of the river felt separated from the remainder of the county. It was felt those factors presented a substantial problem in devising district boundaries. As Judge Hood testified nearly ten percent of the county's population resided in one small district found within the city of Brownsville.

On September 16, 1981, the committee held a meeting at which Malone presented 2 reapportionment plans he had drafted based on guidelines given him by the Committee. Both plans developed provided for election of 20 county commissioners from 9 districts. Following discussion the committee tentatively adopted one of Malone's plans. On October 7, 1981, the Reapportionment Committee held a public hearing on the proposed plan. Notice of the public hearing on reapportionment of the county commission was published in the *State Graphics*, a local newspaper. Following that hearing the plan was recommended to the County Commission. The County Commission met to consider the plan and approved it. Judge Hood testified that following the approval of the new reapportionment plan for the County Commission, he reappointed the same Reapportionment Committee to look into reapportionment of the Road Commission and the Board of Education.

On January 8th and 9th of 1982, the reapportionment committee met to discuss reapportionment of the Haywood County Road Commission. The testimony of Judge Hood indicates the committee voted unanimously to recommend to the County Commission that the Road Commission be elected on an at-large basis. On January 18, 1982, the Haywood County Commission passed a resolution asking the State Senator and State Representative for Haywood County to introduce for passage by the Tennessee General Assembly a private act providing for the at-large election of the Road Commission. That resolution provided for a decrease in the number of Road Commissioners from six to five, with the five commissioners designating one of their number to serve as chairman each year. The legis-

lators, acting on the request from the Haywood County Commission, introduced the private act, which the General Assembly passed on March 25, 1982. Subsequently on April 19, 1982, the County Commission met to consider approval of the private act. Judge Hood testified that a two-thirds vote of the commission was needed for approval. However, on the first vote the measure failed to get the necessary two-thirds vote. The committee undertook further discussion of the matter and a second vote was taken following approval of a motion for reconsideration. Judge Hood stated that on the second vote the commission adopted the private act, 14 votes in favor, 5 votes against, with one member absent. Of the 4 black commissioners on the board, 3 voted against the at-large measure. The record indicates that the only black commissioner to vote for the at-large election of County Commissioners, stated he was opposed to the measure. However, he did not want to delay the upcoming election, and he hoped following the August 5, 1982, election the county would return to the single member district elections of Road Commissioner.

In his testimony Judge Hood stated he felt there were three reasons to reapportion the Road Commission with the election of its members on an at-large basis. He stated that race was not one of the reasons. Judge Hood said his reasons were:

1) The population shift, as reflected by the 1980 census, resulted in an unequal population distribution requiring redistricting.

2) There was a problem in continuing to elect Road Commissioners from single member districts because now there were 9 districts rather than the previous 10 from which to elect 5 commissioners. Consequently, he felt there was no way to equally divide the commissioners among the districts for election, and

3) Some Road Commissioners then in office had more power than others resulting in an unequal distribution of funds for roads in some parts of the county.

The Court does not dispute the fact that reapportionment of the Road Commission may have been necessary because of the shift in population in Haywood County as indicated by the 1980 census. However, the Court finds untenable Judge Hood's two remaining reasons. Additionally, the Court does not believe the shift in population, the only sound basis for reapportionment, requires that Haywood County elect Road Commissioners on an at-large basis rather than from single member districts as it has been doing since the year 1937.

In his testimony Judge Hood stated that race was not a factor in the development of an at-large election plan for Road Commission seats. While the Court recognizes that great strides toward resolving racial prejudices have been made in Haywood County, events surrounding adoption of the at-large plan and relevant past history dictate the conclusion that, notwithstanding assertions to the contrary, race appears to have been a factor. The record indicates that in January of 1982 Judge Hood received visits and telephone calls from concerned citizens complaining to him that the at-large election plan was discriminatory in that it diluted black voting strength. Judge Hood testified that he and members of the County Commission, at the behest of the NAACP and other community organizations, attended a meeting at the First Baptist Church in Brownsville, Tennessee, to discuss the plan in the spring of 1982. At that meeting, Judge Hood and others heard complaints from black citizens in regard to the discriminatory nature of the plan. Furthermore, Judge Hood received telephone calls from both the State Senator and State Representative of Haywood County regarding a petition by black citizens against the measure. A delegation of black citizens walked out of the commission meeting in protest when the plan was approved.

Clearly, the racial implications of the at-large plan was an issue that was dealt with. To say that race was not an issue and was ignored is inconsistent with the record in this case and the racial history of Haywood County. The Court is troubled by the as-

sertion of Judge Hood and Mike Malone that equal distribution of population was the predominate reason for switching from election of Road Commissioners by districts to the at-large plan.

Malone testified that he drew up a plan with 9 districts of near equal population. In doing so, he states that race was not a factor. In his opinion and that of Judge Hood, because there were only 5 Road Commissioners, a mathematically equal distribution of road commissioners to districts could not be achieved. Simply stated, 9 districts could not be equally divided among 5 commissioners; thus, they concluded there must be an election of Road Commissioners on an at-large basis. Mr. Malone and Judge Hood assert that the above conclusion was dictated by simple logic and mathematics rather than considerations of race.

The Court finds, however, that race appears to have been a big factor in changing the number of districts from 10 to that of 9 under the at-large plan. In effect, racial considerations appear to have prompted the peculiar logic and mathematics stated in justification of the plan. Malone states that he was not asked to develop a ten-district plan, though he could have done so. In defense of the plan, Malone states that race could not have been a factor in his drafting of the plan because he had no statistics as to the racial make-up of the county. In fact, he asserts that he knew very little about the geography of the county. Malone also testified that he had never heard of the concept that at-large voting dilutes minority voting strength.

The Court, however, does not accept Mr. Malone's assertions as credible for the following reasons. He testified that he had assisted Judge Hood and Haywood County on two previous occasions; in matters pertaining to subdivision regulation and qualification for the National Flood Insurance Program. The Court finds that, contrary to his assertion, Malone had to be familiar with Haywood County and its geography. He also testified that before the hearing of the case he had read a United States Supreme Court case dealing with the subject of reapportionment. Apparently he was referring to *Rogers v. Lodge*, ---- U.S. ----, ----, 102 S.Ct. 3272, 3279, 73 L.Ed.2d 1012 (1982) which specifically discussed diluting the voting power of black citizens in Burke County, Georgia. Moreover, the Court does not find as credible the assertion that Haywood County would choose a person so assertedly lacking in knowledge of the county, its geography and demography to draft a reapportionment plan. Also, Mr. Malone is highly educated and experienced. He possesses a bachelor's degree in business administration. He has worked for the State Planning Commission for 13 years. He testified he had assisted other counties in reapportionment prior to drafting the Haywood County plan. It defies reason to believe that Mr. Malone had *never heard* of the basic concept that at-large voting dilutes minority voting strength, especially in light of his background. The Court rejects this testimony as being incredible.

Thus, the Court finds that racial considerations brought about the change in the number of districts from 10 to 9. Had there been developed a 10 district plan, Road Commissioners could have been continued to be elected from districts rather than on an at-large basis. The testimony of Mr. Malone indicates that he could have drawn a ten district plan adhering to the one person one vote principle. He did not do so, nor did the county ask him to do so, even in the face of a multitude of complaints regarding the discriminatory result of the 9 district at-large plan. The Court does find credible Mr. Malone's statement that he could draft a better plan.

Creation of 9 districts from which to elect Road Commissioners rather than the previous number of ten districts was not arrived at arbitrarily, nor did it magically appear, nor was it mathematically dictated, nor was it dictated by an attempt at consistency. Rather the Court finds from the evidence in the record it occurred as a result of the purposeful intention to dilute black voting strength in Haywood County, Tennessee.

Judge Hood testified that the Haywood County Reapportionment Committee faced

special problems in devising equal representation for Road Commissioner districts. He listed those special problems as being:

1) Approximately 46% to 47% of the population of Haywood County is located within the city limits of Brownsville, Tennessee.

2) The Hatchie River, being a natural boundary, presented a special problem because of the scarcity of population south of that river in Haywood County. Judge Hood said the Hatchie River tends to separate people and make them feel they are not part of the whole county. He testified there are three bridges across that river located on Highway 54 to Covington, Tennessee; Highway 70 to Memphis, Tennessee; and Highway 76 to Somerville, Tennessee.

The Supreme Court of the United States long ago ruled those special problems listed by Judge Hood impermissible factors in justifying deviation from the equal population principle basic to reapportionment:

> Consideration of area alone provides an insufficient justification for deviations from the equal population principle. Again, people, not land or trees or pastures, vote. Modern developments and improvements in transportation and communications make rather hollow, in the mid-1960's, most claims that deviations from population—based representation can validly be based solely in geographical considerations. *Reynolds v. Sims*, 377 U.S. 533, 580, 84 S.Ct. 1362, 1391, 12 L.Ed.2d 506 (1963).

How much more true is that statement in 1982.

As stated, plaintiffs have filed this action seeking declaratory and injunctive relief against the newly-enacted at-large election plan for Road Commissioners of Haywood County. At the hearings, plaintiffs specifically moved the Court to enjoin the election of Road Commissioners presently set for August 5, 1982.

> In seeking preliminary injunctive relief [plaintiffs] assumed the heavy burden of showing either a substantial likelihood of success on the merits coupled with the possibility of some irreparable injury to [themselves] or that [they have] raised serious questions going to the merits and that the balance of hardships tips decidedly in [their] favor. Even in such a case injunctive relief would be justified only as a means of maintaining the status quo. (Citations omitted).

*Halder v. Avis Rent-A-Car System, Inc.*, 541 F.2d 130 (2d Cir. 1976).

In approaching the plaintiffs' request, then, the Court must first look to plaintiffs' likelihood of success on the merits. This entails an examination of the merits of plaintiffs' legal contentions and analysis.

Plaintiffs contend that the enactment of the at-large election plan violates the Fourteenth and Fifteen Amendments to the Constitution, and also Section 2 of the Voting Rights Act of 1965, as amended. Since the relevant standards of proof to show a violation of the Fourteenth and Fifteenth Amendments and of the Voting Rights Act differ, each will be discussed in turn.

In recent years the United States Supreme Court has made clear the standard of proof which must be met in order to show a violation of the Fourteenth and Fifteenth Amendments in the context of claims of racial discrimination affecting voting.

The case of *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), was a class action brought in the United States District Court for the Southern District of Alabama by a class of black citizens of the City of Mobile, Alabama, (a city governed by a commission consisting of three members elected at-large, jointly exercising all legislative, executive, and administrative power in the city) alleging, among other things, that the city's practice of electing commissioners at-large by majority vote unfairly diluted the voting strength of blacks in violation of the Fourteenth and Fifteenth Amendments. The District Court found the plaintiff's constitutional rights had been violated. The United States Court of Appeals for the Fifth Circuit affirmed on appeal.

The Supreme Court, however, in a deeply split decision, reversed, finding that racially discriminatory motivation is a necessary ingredient of a Fifteenth Amendment violation, and that only if there is a purposeful discrimination can there be a violation of the Equal Protection Clause of the Fourteenth Amendment.

Our decisions ... have made clear that action by a State that is racially neutral on its face violates the Fifteenth Amendment only if motivated by a discriminatory purpose.

446 U.S. at 62, 100 S.Ct. at 1497.

*White v. Regester*, 412 U.S. 755 [93 S.Ct. 2332, 37 L.Ed.2d 314]; *Whitcomb v. Chavis, supra* [403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363]; *Kilgarlin v. Hill*, 386 U.S. 120 [87 S.Ct. 820, 17 L.Ed.2d 771]; *Burns v. Richardson*, 384 U.S. 73 [86 S.Ct. 1286, 16 L.Ed.2d 376]; *Fortson v. Dorsey*, 379 U.S. 433 [85 S.Ct. 498, 13 L.Ed.2d 401]. We have recognized, however, that such legislative apportionments could violate the Fourteenth Amendment if their purpose were invidiously to minimize or cancel out the voting potential of racial or ethnic minorities. See *White v. Regester, supra; Whitcomb v. Chavis, supra; Burns v. Richardson, supra; Fortson v. Dorsey, supra.* To prove such a purpose it is not enough to show that the group allegedly discriminated against has not elected representatives in proportion to its numbers. *White v. Regester, supra* [412 U.S.] at 765–766 [93 S.Ct. at 2339]; *Whitcomb v. Chavis*, 403 U.S., at 149–150 [91 S.Ct. at 1872]. A plaintiff must prove that the disputed plan was "conceived or operated as [a] purposeful devic[e] to further racial ... discrimination," *id.*, at 149 [91 S.Ct. at 1872].

This burden of proof is simply one aspect of the basic principle that only if there is purposeful discrimination can there be a violation of the Equal Protection Clause of the Fourteenth Amendment. See *Washington v. Davis*, 426 U.S. 299 [96 S.Ct. 2040, 48 L.Ed.2d 597]; *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 [97 S.Ct. 555, 50 L.Ed.2d 450]; *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256 [99 S.Ct. 2282, 60 L.Ed.2d 870]. The Court explicitly indicated in *Washington v. Davis* that this principle applies to claims of racial discrimination affecting voting just as it does to other claims of racial discrimination.

466 U.S. at 66–67, 100 S.Ct. at 1499.

In short, under the rule in *Mobile v. Bolden*, disproportionate impact alone is not sufficient to show a violation under the Fourteenth and Fifteenth Amendments. Courts must look to evidence of purpose. Necessarily, however, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts. *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Further, "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights v. Metro Housing Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

Very recently the Supreme Court, in *Rogers v. Lodge*, — U.S. —, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982), reaffirmed its decision in *Mobile v. Bolden, supra*, that a contention of voting dilution can produce a violation of the Fourteenth Amendment only if the alleged unconstitutional plan was conceived or maintained as a purposeful device to further racial discrimination. Results alone are not enough.

The law regarding the standard of proof required to show a violation of the Voting Rights Act has undergone vast changes in recent years. In *Mobile v. Bolden, supra*, 446 U.S. at 60–61, 100 S.Ct. at 1496, the Supreme Court discussed the Voting Rights Act (more specifically § 2 of the Act). There, the Court found that "it is apparent that the language of § 2 no more than elaborates upon that of the Fifteenth Amendment, and the legislative history of § 2 makes clear that it was intended to have an effect no different from that of the Fifteenth Amendment itself." As stated, the Court then went on to find that the

Fifteenth Amendment is violated only if action by a State that is racially neutral on its face was motivated by a discriminatory purpose.

When *Mobile v. Bolden* was decided, § 2 of the Voting Rights Act read as follows:

No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color.

On June 29, 1982, the President signed into law a bill extending and amending the Voting Rights Act. The amended § 2 of the Act reads as follows:

a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which *results* in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color.

b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the state or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the state or political subdivision is one "circumstance" which may be considered, provided that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population. (emphasis added).

The legislative history of the above amendment makes its meaning above question. The Senate Judiciary Committee Report on the Voting Rights Act Extension states as follows:

The proposed amendment to Section 2 of the Voting Rights Act is designed to restore the legal standard that governed voting discrimination cases prior to the Supreme Court's decision in *Bolden.* In pre-*Bolden* cases plaintiffs could prevail by showing that a challenged election law or procedure, in the contex of the total circumstances of the local electoral process, had the result of denying a racial or language minority an equal chance to participate in the electoral process. Under this results test, it was not necessary to demonstrate that the challenged election law or procedure was designed or maintained for a discriminatory purpose.

Although the Voting Rights Act Amendment in no way affects the recent Supreme Court interpretations of the Fourteenth and Fifteenth Amendments, it does make abundantly clear that to show a violation of the Voting Rights Act, a plaintiff need not prove intent, but merely results.

Pursuant to the above stated standard for granting or denying a preliminary injunction, the Court must determine whether plaintiffs have a substantial chance of success on the merits under either the intent test of the Fourteenth and Fifteenth Amendments or the results test of the Voting Rights Act. After a thorough consideration of the entire record, the oral argument of the parties, and the applicable law, the Court finds that plaintiffs do have a substantial likelihood of success under either theory.

The evidence is clear the new at-large plan for electing Haywood County Highway Commissioners would result in a dilution of the voting strength of blacks in that county.

In assessing the constitutionality of at-large and multi-member district voting schemes pursuant to the required intent test, there are several factors which a court must consider. Among these are a lack of minority access to the candidate selection process, unresponsiveness of elected officials to minority interests, a tenuous state policy underlying the preference for multi-

member or at-large districting, and the existence of past discrimination which precludes effective participation in the electoral process. Factors which enhance the proof of voting dilution are the existence of large districts, anti-single shot voting provisions, and the absence of any provision for at-large candidates to run from geographic sub-districts. See *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973).

The Court finds these factors and more to have been met, which afford some evidence of discriminatory intent:

1) There is overwhelming evidence of bloc voting along racial lines.
2) Although approximately half the population in Haywood County is black, no black has ever been elected to a countywide office.
3) Until 1960, no blacks were registered to vote in Haywood County.
4) There is a long history of discrimination in education in Haywood County.
5) Past history of Poll Tax, Secret Ballot Law, and Registration Law has contributed to denial of access to the political process by blacks in Haywood County from 1880 until 1960.
6) The size of the county, combined with the much greater proportion of blacks below the poverty level, make it more difficult for blacks to run for office, to get to the polls on election day, or to have faith they can reasonably expect to elect black candidates to office.

Although Haywood County has made great strides toward racial equality in the last few years, its contrary history has made that County known throughout the United States. Given this history of racial inequality and the compelling factors in this record, the Court finds that it is just not credible for the Court to find that race was not considered. The evidence is clear in this record that the dissatisfaction of black citizens in the community and the great possibility of voter dilution by the new reapportionment plan was made known to the County Commission before the plan was adopted.

It is interesting to note that this new reapportionment plan was adopted shortly after an increase in complaints by black citizens over the conditions of roads in their districts.

This is an application for a preliminary injunction. It is not the Court's duty at this time to make final conclusions as to law and facts, but rather to assess the likelihood of plaintiffs' success at a trial on the merits. The Court finds plaintiffs' likelihood of success to be great.

After a balancing of the hardships which an injunction at this time would produce, the Court finds the scale tips in favor of plaintiffs.

For the above stated reasons, the Court hereby enjoins the election of the Haywood County Highway Commissioners presently set for August 5, 1982, pending a hearing on the merits of this case.