Rabbi Yitzchok LEBLANC–STERN-BERG, Chanie Leblanc–Sternberg, Fred Walfish, and Lewis Kamman, Plaintiffs,

v.

Robert FLETCHER, Raymond Kane, Robert Chirkis, Paul Berliner, Maureen Kendrick, Andrew De Podwin, Marianna Cucolo, John C. Layne, John McLaughlin, Janice Stern, and Nick Vertullo, Individually and in their capacity as Officers and Board Members of the Airmont Civic Association, Pamela Scavera, the Airmont Civic Association, Town of Ramapo, Herbert Reisman, Individually and in his capacity as Ramapo Town Supervisor, and Sylvia Hershkowitz, in her capacity as the Town Clerk of the Town of Ramapo, Defendants.

No. 91 Civ. 2550 (GLG).

United States District Court,
S.D. New York.

May 14, 1991.

Coudert Bros. (Kevin W. Goering, Alan J. Straus, P. Rivka Schochet, Jeanne M. Hamburg, of counsel), New York City, for plaintiffs.

Blackburn and Rice (Terry Rice, of counsel), Suffern, N.Y., for defendants Fletcher, Chirkis, Kendrick, De Podwin, Cucolo, Layne, Vertullo, and the Airmont Civic Ass'n.

Joseph A. Maria, P.C. (Joseph A. Maria, of counsel), White Plains, N.Y., for defendants Reisman, Hershkowitz and the Town of Ramapo.

Lovett & Gould (Jonathan Lovett, of counsel), White Plains, N.Y., for defendants Stern and Berliner.

## OPINION

GOETTEL, District Judge:

## I. BACKGROUND

A large portion of the Town of Ramapo is a state park and undeveloped land. In the occupied area, a "village movement" has resulted in the formation of eleven incorporated villages within the town borders along its perimeter.[1] An incorporated village controls the tax base within its boundaries and has the authority to execute its own zoning laws, run schools, operate police, fire, water and sewage departments and regulate the use of the streets. As a rule, the boundaries of a village may not exceed five square miles, N.Y. Village Law § 2–200, subd. 1(a), unless the borders of the village are coterminous with another district, N.Y. Village Law § 2–200 subd. 1(b), (c).

According to plaintiffs, the Orthodox Jewish population in the Town of Ramapo, currently between 22,000 to 26,000 or 23 to 27 percent of the Town's total population, has increased dramatically over the last ten years. Because strict observance of Judaism requires the availability of a large infrastructure, Orthodox Jews tend to dwell in closely knit communities. A large segment of the Orthodox Jewish population resides as a geographically compact minority within the central unincorporated Town where they have been an active and vocal force in Town government. In addition, the populations of at least two of the villages are predominantly Orthodox Jewish. When moving into communities where the population is not Orthodox Jewish, the Orthodox Jews cluster their residences out of necessity.

In 1986, a group of citizens signed a petition to incorporate the Village of Airmont, located in the southeastern area of Ramapo.[2] The petition was presented to the Town and Town Supervisor and a public hearing was held on April 1, 1987. Defendant Herbert Reisman, Supervisor of the Town of Ramapo, determined that the petition complied with the requirements of Article 2 of the New York State Village Law and gave his reluctant approval. (The

---

**1.** These villages are Sloatsburg, Hillburn, Suffern, Montebello, Pomona, Wesley Hills, New Hempstead, New Square, Kesar, Spring Valley and Chestnut Ridge. Attempts to incorporate other areas in Ramapo have failed.

**2.** The boundary of the village was set in July 1986 by a number of individuals supporting incorporation. The boundaries, as set, enclose 4.93 square miles. The southern border is the New Jersey state line. To the north, the length of the New York State Thruway acts as a border. The eastern border runs along Saddle River Road which directly abuts the Village of Chestnut Ridge. The western border is a combination of the border of the Village of Montebello and railroad tracks owned by Con Rail. A small triangle of undeveloped land in the southeast corner was not included in order to keep the village under five square miles. The only other unincorporated portion of Ramapo which is geographically contiguous are two neighborhoods on the western border, Suffern Park and Spook Rock Road. Suffern Park was omitted from the proposed village at the request of its residents; the inclusion of Spook Rock Road would have raised the size of the village above the permissible limit. The resulting village is almost square unlike some of the other villages in the Town.

We were advised at oral argument that originally the village included the Park Avenue Estates area which was undeveloped land at that time. As that area became developed, consideration was given to not including it within the boundaries of the village. At the insistence of Maureen Kendrick, an ACA member and a defendant in this case, however, the village's northeastern boundary was drawn to include the area where her home was located and Park Avenue Estates was necessarily included.

Town is opposed to village incorporations since it diminishes the Town's tax base.) A referendum on the issue of incorporation was scheduled pursuant to N.Y. Village Law § 2–212.

The sufficiency of the petition with respect to the description of the village boundary was challenged in an Article 78 proceeding. On appeal, the court held that, while not conforming to the boundary forms specified in the statute, the metes and bounds contained in the petition described the boundary of the proposed village in a readily ascertainable fashion and was therefore sufficient. *Lefkowitz v. Reisman,* 144 A.D.2d 465, 534 N.Y.S.2d 2, 4 (2d Dep't 1988), *appeal denied,* 73 N.Y.2d 704, 537 N.Y.S.2d 492, 534 N.E.2d 330 (1989). The incorporation was approved in a referendum on January 30, 1989, by a vote of 1692 to 601, and another Article 78 proceeding was filed attempting to nullify the results of that election. This attempt failed because the petitioner lacked standing. *Schreiber v. Gorman,* 561 N.Y.S.2d 815 (2d Dep't 1990).

On April 10, 1991, the Secretary of State signed the certificate of incorporation for the Village. A Village Clerk was appointed on April 15, 1991 and she, in turn, appointed four election officials. On April 23, 1991, the Village Clerk posted and published a notice of election for Village Mayor and for Village Trustees. The notice posted at Town Hall stated that the election would take place on Thursday, May 16, 1991.[3] Upon election of the village officials, the village will start to function.

The impetus to incorporate Airmont came from a group of residents who formed the Airmont Civic Association in 1986. Defendants maintain that ACA was formed to advance a number of civic goals, including the promotion of effective zoning administration and enforcement and to implement the incorporation of the Airmont area as a village. ACA has actively opposed the establishment of synagogues in local homes or home offices. There are more than mere hints in the record of anti-Orthodox Jewish sentiments on the part of certain ACA members. However, ACA has been involved in other civic activities such as securing a telephone for a senior citizen complex and objecting to zoning violations committed by a local swim and recreational club.

The plaintiffs in this case are Orthodox Jews, residents since 1987 (which was after the selection of village boundaries) of a development called Park Avenue Estates. Because travel by car on the Sabbath and on holidays is barred by Jewish law, these residents must walk to synagogue for worship. The nearest synagogue is located well over a mile away (outside the Airmont area), but the Park Avenue residents cannot join that congregation because additional membership would take the synagogue above its legal capacity.[4]

Rabbi Sternberg, one of the plaintiffs, applied to the Ramapo Zoning Board for permission to establish a professional home office where, among other uses, the Orthodox Jewish residents of Park Avenue Estates (consisting of eight families) could gather for Sabbath and holiday services. Such uses are permitted in the Town of Ramapo[5] and many such small synagogues

---

3. The notice of election published in the local newspaper erroneously stated that the election would take place on Saturday, May 18, 1991. This error was subsequently corrected and plaintiffs, who observe Saturday as the Sabbath, have not argued that their right to vote has been infringed as a result of this error.

4. The Town allows a professional home office to be used as a synagogue provided that attendance does not exceed forty persons.

5. The Ramapo Planning Board, by a 4 to 3 vote, approved a home professional office in the Sternberg home where up to 40 people could congregate for religious services. Two Article

78 proceedings were filed by neighbors, challenging this permitted use. Although defendants contend that Sternberg's contemplated use of his home was adjudged not to be a permitted use by the New York State courts, in reality, the courts held that the Ramapo Planning Board had failed to make sufficient findings of conformity with the zoning code as required by law. In neither case, did the court reach the issue of whether an in-home synagogue was a permitted use by the Ramapo Zoning Code. *See In the Matter of Keane,* Index No. 6524/89 (N.Y. Sup.Ct. March 29, 1990); *In the Matter of Platt,* Index No. 6552/90 (N.Y.Sup.Ct. April 2, 1991).

exist within the unincorporated Ramapo area.[6] ACA opposes a synagogue established in a residence—its position is that such use is not permitted by the Ramapo zoning laws and part of its agenda is devoted to strict enforcement of the Zoning code. Rabbi Sternberg still hopes to establish a synagogue in his home office.

As soon as incorporation papers for Airmont were signed by the Secretary of State, plaintiffs filed their complaint alleging that the establishment of Airmont is illegal because its borders were drawn with an intent to exclude Orthodox Jews through strict zoning laws. The primary relief sought is dissolution of an already incorporated village.

By order to show cause, plaintiffs have brought this motion for a preliminary injunction, attempting to stop the election scheduled for May 16, 1991. Without the election, the Village of Airmont will be unable to begin functioning. Plaintiffs acknowledge that this motion is a back door attempt to stop a village that is already a legal entity.

## II. PRELIMINARY INJUNCTION

### A. *Preliminary Matters*

■ A party to be enjoined must be before the court. Plaintiffs wish to enjoin an election which is managed by the Airmont Village Clerk and the four officials appointed by her. *See* N.Y. Village Law §§ 2–240, 2–244, 2–246. Plaintiffs run into immediate problems because the complaint does not name these people as defendants and they are, therefore, not before this court.

At oral argument, plaintiffs advised this court that they were amending the complaint and perfecting service. Today, they advise that they have not been able to serve these defendants whom, they contend, may be attempting to avoid service. In any event, it is too late to serve them with the order to show cause. Since the other defendants deny having any control over the election procedures, this alone

would seem to require that the preliminary injunction be denied. However, we will also consider the merits of the motion.

### B. *The Injunction*

■ A preliminary injunction is an extraordinary remedy not to be routinely granted. *Patton v. Dole*, 806 F.2d 24, 28 (2d Cir.1986). The purpose of a preliminary injunction is to preserve the status quo until a hearing can be had on the merits of the case. The general standard for granting preliminary injunction relief in this circuit is well settled. To justify the issuance of an injunction, the plaintiff must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam). However, where the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the less rigorous fair-grounds-for-litigation standard does not apply. *Union Carbide Agricultural Production Co. v. Costle*, 632 F.2d 1014, 1018 (2d Cir.1980), *cert. denied*, 450 U.S. 996, 101 S.Ct. 1698, 68 L.Ed.2d 196 (1981). The election has been scheduled as required by state law and any election is, without question, in the public interest. Therefore, in order to prevail on this motion, plaintiffs must show both that they will suffer irreparable harm if the election of village officials is not enjoined and that they are likely to prevail on the merits of the claims asserted.

A showing of irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction." *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir.1983) (quoting 11 C. Wright & A. Miller, *Federal Practice & Procedure* § 2948, at 431 (1973)). The moving party must first demonstrate that

---

**6.** Until 1986, a small Orthodox synagogue had existed in a home in the Airmont area. Its use was subsequently restricted in an undescribed fashion after neighbors filed an official complaint.

such injury is likely before the other requirements will be considered.

■ This case has a unique posture in that plaintiffs are both too early and too late for the relief they desire. Plaintiffs ultimately seek to dissolve the village. In that sense, they are too late because the village has been legally incorporated. With their fear of exclusionary zoning, plaintiffs are too early because no state actions have been taken suggesting that such zoning laws are imminent. Recognizing this dilemma, plaintiffs wish to stop the election because the effect would be to render the village a nullity since, without officials, it would be unable to function pursuant to state law.

Their argument is necessarily premised on the irreparable harm that would accrue as a result of holding the election. To that end, plaintiffs contend that violations of fundamental constitutional rights constitute *per se* irreparable harm for the purposes of determining whether injunctive relief should issue, regardless of the brevity of the time period during which such violations continue. There is no question that if constitutional interests are threatened or in fact being impaired at the time injunctive relief is sought, a preliminary injunction is appropriate. *Elrod v. Burns*, 427 U.S. 347, 373–74, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976) (threat of discharge if plaintiff refused to support Democratic Party warrants injunctive relief to prevent irreparable harm); *Foster v. Kusper*, 587 F.Supp. 1191, 1194 (N.D.Ill.1984) (voters would suffer irreparable harm to their constitutional right to freedom of association and their corollary right to vote if the candidate garnishing the second highest number of votes were seated as committeeman).

Plaintiffs argue that their right to vote as protected by the Fourteenth Amendment, *see Whitcomb v. Chavis*, 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971); *Wright v. Rockefeller*, 376 U.S. 52, 56, 84 S.Ct. 603, 605, 11 L.Ed.2d 512 (1964), will be violated if the election is not enjoined and this constitutes irreparable harm. "[T]he right of suffrage is a fundamental matter in a free and democratic society ... [and] since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds v. Sims*, 377 U.S. 533, 562, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506 (1964). However, no one is impinging on plaintiffs' right to vote and indeed, three slates of candidates, only one of which is supported by ACA, have been presented to the Airmont voters. The plaintiffs are contending that the village should not exist and therefore no elections should be held. If they can prevent the election, they will have achieved *de facto* the ultimate relief sought—the elimination of the village.

Plaintiffs claim that the borders of Airmont were selected on the basis of religious and cultural animus, chosen to exclude groups of Orthodox Jews from the village. Any redistricting for invidious purposes is illegal. *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); *see Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982). Thus, they contend, though facially lawful, the incorporation of Airmont would be unlawful if done to accomplish an unlawful end. *United States v. Reading Co.*, 226 U.S. 324, 357, 33 S.Ct. 90, 98, 57 L.Ed. 243 (1912). The unacceptable result, plaintiffs contend, is dilution of their vote in violation of the constitution. *Gomillion*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110.[7] Initially,

---

**7.** Plaintiffs argue that *Gomillion*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110, is directly analogous to their situation. In that case, the boundaries of the City of Tuskegee were redefined by the Alabama Legislature in such a way as to exclude black voters. The City, originally shaped like a square, was redrawn as an irregular twenty-eight sided figure. The impact of the redistricting was to deprive previously franchised black voters of their right to vote in Tuskegee elections. Plaintiffs contend that they have been deprived of their right to vote in Ramapo. However, they will still be able to vote in Town elections. Moreover, to the extent that their futures are controlled by events in Airmont, the Orthodox Jews have not been disenfranchised—instead, they have been given a vote as residents of a newly incorporated village. Thus, we do

we note little evidence of gerrymandering as the term is usually understood. The village is compact, circumscribed and virtually as large as the maximum allowed. What plaintiffs object to is the formation of a village in the southern part of the unincorporated town where there is a minimal Orthodox Jewish presence. (Among the other eleven villages are some that were formed precisely because they had a large Orthodox Jewish population which wished to control local politics.)

Irreparable harm must be shown by the moving party to be imminent, not remote or speculative. *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir.1989). Plaintiffs argue that a voter should not be subjected to an election which is unconstitutional and in this case, since they argue the village should not be in existence, the mere holding of this election is the constitutional violation and, therefore, irreparable harm.[8]

Plaintiffs' premise fails here, precisely because of the fact that we are considering a preliminary injunction. In order to demonstrate irreparable harm, a plaintiff must prove that the disputed plan was " 'conceived or operated [as] a purposeful device to further racial discrimination.' " *Mobile v. Bolden*, 446 U.S. 55, 70, 100 S.Ct. 1490, 1501, 64 L.Ed.2d 47 (1980) (plurality opinion) (quoting *Whitcomb v. Chavis*, 403 U.S. at 149, 91 S.Ct. at 1872); *see Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). In addition, the Supreme Court has expressly stated that disproportionate effects alone do not estab-

lish a violation of equal protection. *Id.* 446 U.S. at 67, 100 S.Ct. at 1499; *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Plaintiffs indicated at oral argument that they would require at least 60 days to prepare for an evidentiary hearing necessary to establish the constitutional violation involved in the Village's incorporation. Thus, the clear proof of the constitutional violation necessary to establish irreparable harm does not exist at this juncture.[9] A possible constitutional violation is not irreparable harm for the purposes of a preliminary injunction. *See Elrod v. Burns*, 427 U.S. at 373, 96 S.Ct. at 2690 (noting that "it was clear that First Amendment interests were either threatened or in fact being impaired at the time relief was sought.")

To support their alternative argument as to how they will suffer irreparable harm if the election is not enjoined, plaintiffs look forward, hypothesizing that the election will set in motion a series of events that will necessarily perpetuate and permit further gross violations of the plaintiffs' civil rights. Memorandum of Law in Support of Plaintiffs' Motion for Injunctive Relief, at 36. These events can be summarized as follows:

—the passing of zoning ordinances which would preclude local houses of worship such as the one Rabbi Sternberg wishes to establish in his professional home office;

—a negation of their political influence over zoning decisions;

—reduced migration of Orthodox Jews into Airmont resulting in persistent dis-

---

not find *Gomillion* to control except for its proscription on intentionally discriminatory dilution of votes. *See Caserta v. Village of Dickinson*, 491 F.Supp. 500, 506 n. 14 (S.D.Tex.1980) (distinguishing *Gomillion* on the basis that the redrawn district did not deprive the plaintiffs of a pre-existing right to vote), *aff'd in part, rev'd in part*, 672 F.2d 431 (5th Cir.1982).

**8.** Plaintiffs have directed our attention to three cases in which preliminary injunctions were granted. We find those cases readily distinguishable. In two cases, the courts never addressed the issue of irreparable harm, assuming instead that it exists. *See Watson v. Commissioners Court of Harrison County*, 616 F.2d 105,

107 (5th Cir.1980); *Taylor v. Haywood County, Tennessee*, 544 F.Supp. 1122 (W.D.Tenn.1982). That presumption does not emerge so readily in this case. In *Foster v. Kusper*, 587 F.Supp. at 1193, the election had already occurred and the certification of the winner was at issue. The facts clearly pointed to irreparable harm.

**9.** Plaintiffs have offered evidence indicating that the drive to incorporate the Village of Airmont was animated by a desire to strictly enforce zoning laws which might be anathema to the Orthodox Jewish way of life. However, defendants have submitted evidence indicating otherwise. Clearly, factual questions exist.

parity in the ratio of Orthodox Jews to other residents of the Village.

All of these harms, while possible, can only be characterized as speculative and not imminent for several reasons. First, while it may very well be that candidates supported by ACA would pass zoning laws which would negatively impact the Orthodox Jewish way of life, we must note that there are three slates of candidates on the election ballot on May 16, 1991 and some of the candidates are Jewish. It is inappropriate for this court to speculate on the outcome of an election. Moreover, it would be equally presumptuous for us to predict what actions would be taken by the incoming officials with respect to zoning. *Davis v. Bandemer,* 478 U.S. 109, 132, 106 S.Ct. 2797, 2810, 92 L.Ed.2d 85 (1986).

Additionally, participation in zoning decisions is not limited to the electoral process. Any proposed zoning laws must be the subject of a public hearing before being passed. N.Y. Village Law § 7–706. Thus, the Orthodox Jewish community would have the opportunity to publicly voice their opposition to any zoning ordinances which would negatively impact them. And though we may be naive, we would hope that the village officials would be cognizant of their duty, not only to the majority, but to the minorities within the village and of their higher duty to obey the laws of this land. *Davis v. Bandemer,* 478 U.S. at 132, 106 S.Ct. at 2810 ("an individual ... who votes for a losing candidate is usually deemed to be adequately represented by the winning candidate and to have as much opportunity to influence that candidate as other voters in the district. We cannot presume in such a situation, without actual proof to the contrary, that the candidate elected will entirely ignore the interests of those voters.") Indeed, "[a] citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be." *Lucas v. Forty–Fourth General Assembly of State of Colo.,* 377 U.S. 713, 736–37, 84 S.Ct. 1459, 1474, 12 L.Ed.2d 632 (1964).

■ Looking forward, plaintiffs also argue that if this election takes place, their franchise is affected. They contend that they will no longer be able to vote in Town elections where Orthodox Jews have some political power. Instead, they will be voting in Airmont elections where proportionately, their numbers have been substantially reduced. However, their right to vote in Town elections and the influence of voters in the unincorporated area on matters pertaining to the village would not be affected by enjoining village elections—only dissolution of the village could accomplish that. Moreover, there is no right to community recognition in any redistricting process. *Mirrione v. Anderson,* 717 F.2d 743 (2d Cir.1983), *cert. denied,* 465 U.S. 1036, 104 S.Ct. 1308, 79 L.Ed.2d 706 (1984). Voting is a personal right and in the absence of invidious discrimination, voters of an ethnic community are not entitled to be grouped together in a single election unit. *Id.* at 745. *See United Jewish Organizations of Williamsburgh, Inc. v. Wilson,* 510 F.2d 512 (2d Cir.1974), *aff'd on other grounds sub nom., United Jewish Organizations of Williamsburgh, Inc. v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977). This evidence is lacking at this stage of the litigation.

As to plaintiffs' contention that Orthodox Jews would choose not to move into Airmont, this is a remote hypothetical resting upon a yet to happen chain of events. Thus, this concern cannot be the basis for finding irreparable harm.

Finally, we note that, the election notwithstanding, should discriminatory intent be found at the root of Airmont's incorporation after a full trial of the issues, the incorporation could be declared null and void. Any adverse impact resulting from the election could be quickly nullified.[10]

This is an application for a preliminary injunction and as such, we have only addressed the issue of whether a status quo must be maintained in the newly incorporated Village of Airmont in order to prevent irreparable injury to the plaintiffs.

---

**10.** Plaintiffs have raised a number of other assertions concerning their constitutional rights

protected by the first amendment and the Fair Housing Act. These contentions are premature.

Our opinion here should not be construed as any evaluation of the merits of this case. The issue of whether discriminatory intent has been at the root of the formation of the Village of Airmont will be resolved after the full development of evidence in the course of this litigation.

Plaintiff's motion for a preliminary injunction is denied.

SO ORDERED.