Rabbi Yitzchok LeBLANC–STERNBERG, Chanie LeBlanc–Sternberg, Fred Walfish, Lewis Kamman, Park Avenue Synagogue, Inc., Plaintiffs,

v.

Robert FLETCHER & Nick Vertullo, Raymond Kane, Maureen Kendrick, and John C. Layne, Individually and in their capacity as Trustees of the Village of Airmont, Defendants.

UNITED STATES of America, Plaintiff,

v.

The VILLAGE OF AIRMONT, Airmont Civic Association, Ralph Bracco, in his capacity as Mayor of the Village of Airmont, John C. Layne, Raymond Kane, Charles Calotta and Ronald Sabo, in their capacities as Trustees of the Village of Airmont, Defendants.

Nos. 91 Civ. 2550 (GLG), 91 Civ. 8453 (GLG).

United States District Court, S.D. New York.

April 25, 1996.

For injunctive order, see 925 F.Supp. 160.

Craig L. Parshall, Law Offices of Craig Parshall, Fredericksburg, Virginia, for Plaintiffs Rabbi Yitzchok LeBlanc–Sternberg, Chanie LeBlanc–Sternberg, Fred Walfish, Lewis Kamman and Park Avenue Synagogue, Inc.

Sara L. Shudofsky, Assistant United States Attorney, Southern District of New York, New York City, for Plaintiff United States of America.

Dennis E.A. Lynch, Dorfman, Lynch & Knoebel, Nyack, New York, and Brian S. Sokoloff, Thurm & Heller, New York City, for Defendants Village of Airmont, Raymond Kane, Maureen Kendrick and John C. Layne.

Edmund C. Grainger, III, McCullough, Goldberger & Staudt, White Plains, New York, for Defendants Robert Fletcher and Nick Vertullo.

### MEMORANDUM DECISION

GOETTEL, District Judge.

Following a reversal of its earlier decisions, *United States v. Village of Airmont,* 839 F.Supp. 1054 (S.D.N.Y.1993), and *Le-Blanc–Sternberg v. Fletcher,* 846 F.Supp. 294 (S.D.N.Y.1994), and remand from the Second Circuit Court of Appeals, *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412 (2d Cir.1995), *petition for cert. filed,* 64 U.S.L.W. 3605 (U.S. Feb. 26, 1996) (No. 95–1381), this Court must now comply with the Second Circuit's directives in fashioning appropriate remedies. The parties in these two actions (which were tried and appealed together) differ entirely as to what is expected of this Court at this point. In order to understand the dispute, it is necessary to review the history of the litigation in some detail.

### HISTORY OF THE LITIGATION

The Town of Ramapo ("Ramapo" or the "Town") in Rockland County, New York, is a large geographical area composed of a number of incorporated villages and unincorporated areas. It has a substantial Orthodox Jewish population, consisting primarily of Hasidic Jews.

In recent years, the tendency of villages to incorporate for purposes of asserting local government control has increased substantially. Indeed, twelve villages have broken away from the Town of Ramapo.[1]

In the Airmont area of the Town, a group calling themselves the Airmont Civic Association ("ACA" or the "Association"), a not-for-profit association, was formed to seek the incorporation of a village ("Airmont" or the "Village"). Although the first president of that Association and a number of its leaders were Jewish, they were not Orthodox, and the Association admittedly sought incorporation of the Village of Airmont because some of its members felt that the Town of Ramapo was adopting zoning measures unduly favorable to Hasidic Jews. Their initial concern was multiple-family housing in areas zoned for single family residences. Another aspect, and a focus of later ACA concern, was the allowance of home synagogues ("shteebles") in residential areas through a liberal interpretation of the Town's Home Professional Office zoning law. Through that provision, groups of up to 49 persons were allowed to attend services in a home in a residential area provided that the portion of the home used for that purpose did not exceed half the dimensions of the ground floor and provided that only two employees were involved.

In early 1989, a referendum on incorporating the Village of Airmont was held, which passed by a three-to-one margin. The operation of the Village was, however, delayed for two years due to litigation commenced by Orthodox groups and real estate interests. The Village was finally incorporated in April 1991. Two days later, before the Village had actually commenced operation, an Orthodox Jewish Rabbi, Yitzchok LeBlanc–Sternberg (who is Hasidic), and members of his congregation instituted a private suit claiming that the formation of the Village violated their First Amendment rights and the Fair Hous-

---

1. A couple of the villages were formed by Orthodox Jewish groups for the admitted purpose of creating Hasidic enclaves so that the village residents could comply with Orthodox Jewish law. The United States government saw no unfair housing problems with respect to the formation of those villages.

ing Act. 42 U.S.C. § 3601 *et seq.* The action principally sought large monetary damages and the dissolution of the Village.[2] The following month Village elections were held, and the slate of candidates supported by the ACA was elected as Mayor and Trustees. (By that point in time, however, the ACA was disbanding and, when sued in this action, defaulted). Upon incorporation, the Village did not adopt a new zoning code but continued operating for a period of time under the Ramapo code. As discussed below, it was not until 1993 that the Village adopted a zoning code.

Prior to the Village's incorporation and the commencement of the litigation, the LeBlanc–Sternberg congregation, which was located in the Airmont section of Ramapo, had already received zoning permission from Ramapo to operate a home synagogue as a "Home Professional Office" under the Ramapo interpretation.[3] The LeBlanc–Sternberg congregation has continuously operated their home synagogue for the last six and one-half years.

In late 1991, the United States commenced a separate action under the Fair Housing Act against the Village and its then Trustees, alleging that the Village had been incorporated for purposes of excluding Orthodox Jews through zoning restrictions on their places of worship. The government sought a declaratory judgment and injunctive relief against further violations. The private action and the government action were consolidated for discovery and eventually trial. The defendants demanded a jury trial on the private action damage claims, but the government's action, including claims for injunctive relief, was tried to the Court. When the actions were tried, the government's case involved factually not only the LeBlanc–Sternberg

congregation but also another congregation headed by a Rabbi Chaim Friedman.[4]

During the first year and a half of the pendency of these actions, there was no zoning activity concerning home synagogues. In January of 1993, however, more than a year and a half after the private action was commenced, and more than a year after the government's action was commenced, Airmont adopted its own zoning code, which was approved at a public meeting without objection. The new code modified the Ramapo zoning provision regarding Home Professional Offices. It kept the same restrictions concerning use of no more than half of the ground floor and no more than two employees but added language indicating that the Home Professional Office should not generate activities inconsistent with a residential area. The change in the zoning code did not result in any amended pleading being filed in either action or any request for temporary injunctive relief being made. Since the date of its passage, the provision of the amended zoning code concerning Home Professional Offices has never been applied or interpreted.

The consolidated cases went to trial in October of 1993. The trial lasted seven weeks. The jury deliberations lasted for a full week—the longest that this Judge has ever seen for a civil case. The private action was submitted to the jury on a special verdict form containing a number of interrogatories. Eventually the jury returned the verdict form answering most questions in favor of the defendants. It found for all of the individual defendants awarding no damages against any of them. It determined that the majority of voters who favored incorporation

---

2. They sought preliminarily to enjoin the election of Village officials but this was denied by the Court because they had not made a showing of irreparable harm. *See LeBlanc–Sternberg v. Fletcher*, 763 F.Supp. 1246, 1252 (1991).

3. While there were legal challenges to that zoning grant, they were not pursued after the incorporation.

4. Rabbi Friedman's congregation had also commenced a separate lawsuit looking for damages of its own. That action remains pending before

a different Judge in the Southern District of New York. That congregation was attempting to build a free-standing synagogue, which did not fall under the home professional office exception. Although Friedman's application to build the synagogue was eventually approved by the Town Planning Board, the congregation had problems with finances and safety aspects of the State's building code. In the interim, it has functioned in the Rabbi's home as a Home Professional Office.

were not motivated even in part by discrimination against Orthodox or Hasidic Jews. It did find, however, that the Village had violated the private plaintiffs' fair housing rights and had conspired to violate their rights to the free exercise of religion or free speech. Despite these findings, the jury did not award any damages against the Village, not even nominal damages. In the view of the only Judge present during these lengthy proceedings, this was a compromise verdict and, to an extent, an inconsistent one. This Court then decided the government's action in favor of the Village and its Trustees, finding essentially that, while some bias against the Orthodox Jews existed among Village officials, the Village had done nothing to interfere with their religious practices or fair housing rights. Consistent with that, we reversed that portion of the jury's verdict that had found against the Village. Both plaintiffs then appealed.

## THE COURT OF APPEALS DECISION

The Court of Appeals first reversed this Court's entry of judgment on behalf of the Village in the private plaintiffs' case. In a lengthy opinion it noted that the defendants had demanded a jury trial on the damage aspects and held that, if a claim for damages is joined with an equitable claim, the right to a jury trial on all issues common to both claims prevails. *LeBlanc–Sternberg, supra,* 67 F.3d at 426.

With respect to the apparent inconsistency of the verdicts, it held that it was the duty of the District Court to harmonize the jury's responses by seeking an explanation supportable by the record to correct the apparent inconsistency. *Id.* at 427. The appellate panel divined that the jury "may have been persuaded that the violative act [of the Fair Housing Act] was the enactment of the Airmont zoning code," *id.* at 428, and that it was a "fair inference" that the jury viewed this as an act designed to limit home synagogues, thus make housing unavailable to Orthodox Jews.[5] *Id.* It, therefore, found the jury's verdict consistent "with fully supportable findings," *id.* at 429, which were reasonable, and it required the District Court to accord the jury's verdict such an interpretation.[6] *Id.* It chastised the trial court for making findings of fact, for weighing the evidence, and for not following findings that were "implicit" in the jury's verdict.[7] *Id.* at 430.

The lengthy decision then cites all of the evidence it could muster from the trial record to support its factual findings. It concluded that, taking the evidence in the light most favorable to the private plaintiffs, "there was ample support for the jury's implicit finding that Airmont's zoning code would be interpreted to restrict the use of home synagogues, that the motivation behind the enactment was discriminatory animus toward Orthodox and Hasidic Jews, and that Airmont pursued this goal jointly with

---

5. Since a Village is an inanimate body which cannot do anything without human action, the Court of Appeals had to explain why the individual defendants who had passed the zoning change were not personally liable. The opinion resolves this by noting that the jury was charged, in answer to its specific question, that the Trustees had legislative immunity with respect to their official acts in voting legislation. *Id.* at 428. As to whom the Village was conspiring with, since it could not conspire with itself or its own officials, the Circuit Court concluded that it was "easily inferable" that it had conspired with the Airmont Civic Association. *Id.* However, the ACA had gone out of existence and ceased activities before the zoning code was amended. Indeed, it had been the subject of a default judgment a year earlier.

6. The jury, having found for the individual defendants and not having awarded any damages, it

would seem that we were dealing solely with injunctive relief, which is always a matter exclusively for the Court.

7. With respect to factual findings, we note that the appellate decision found that numerous outrageous anti-Orthodox statements were made by various of the individual defendants. While there was evidence that such statements were made, there was also evidence of denials by the various defendants of having made such statements, in some instances supported by tape recordings of the hearings in question. Moreover, while the decision recites minutes concerning "a grim picture of a Hasidic belt from Rockland through Orange & Sullivan Countys," *id.* at 418, the minutes were reporting statements made to the group by the Jewish Superintendent of Ramapo who had been named as a defendant in the private action, but had been dismissed on motion by this Court.

ACA." [8] *Id.* at 431. The opinion further held that plaintiffs were entitled to nominal damages because it was "plain error" for the trial court to instruct the jury that it "may award" such damages, rather than that it must do so, citing *Gibeau v. Nellis,* 18 F.3d 107, 110–11 (2d Cir.1994). [9] *Id.* With respect to injunctive relief, it held that on remand the Court should consider "whether injunctive relief may also be appropriate." *Id.* at 432. The Court did uphold the verdict on behalf of the five individual defendants finding that the plaintiffs had received a fair trial and there was no basis for reversal of the verdicts in their favor. *Id.* at 433.

With respect to the government's action, which under this Court's decision had resulted in a complete victory for the defendants, it held that the government can get the benefit of nonmutual offensive collateral estoppel, although it could not have been imposed against the government. *Id.* at 434. Consequently, having made findings resulting in a jury verdict against the Village in the private action, it held that this Court could not properly make findings that contradicted what the appellate decision said the jury had intended. [10] *Id.* The net effect was that by appellate alchemy the government's total loss was converted into a complete victory. The government's action was remanded for injunctive relief and the fashioning of appropriate equitable remedies applying Fair Housing Act principles. *Id.* at 435.

### INJUNCTIVE RELIEF
#### The Defendant Village's Position

The Village opposes granting any injunctive relief. It notes that the zoning code on which the Court of Appeals focused did not come into existence until long after these lawsuits had been filed. The Village argues that there has never been an application by the Orthodox Jews (or anyone else, for that matter) for additional places of worship in the Village, nor has there been a request for interpretation of the zoning code. Consequently, it contends that there has been no demonstration of discriminatory impact, direct or indirect, by the zoning code, either as written or as applied. The Village notes that the private plaintiffs conceded at trial that the Village had not interfered with their worship services. [11] Consequently, it asserts that the plaintiffs have not met their burden of showing any real or immediate threat that they will be wronged, citing *City of Los Angeles v. Lyons,* 461 U.S. 95, 111, 103 S.Ct. 1660, 1670, 75 L.Ed.2d 675 (1983), nor have they demonstrated any indication of real and imminent harm. *Carey v. Klutznick,* 637 F.2d 834 (2d Cir.1980); *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

#### The Court Of Appeals Holding

There is considerable substance to the Village's argument. However, it has one fault—it is contrary to the emphatic directions of the Court of Appeals that injunctive relief must be granted to avoid discrimination in a manner "found to be predictable from the evidence in this record," *LeBlanc–Sternberg, supra,* 67 F.3d at 434, and that "on a practice that ... is about to occur" the Court is authorized to grant injunctive relief. *Id.* at 425. With respect to the claims brought under the Fair Housing Act, we are directed to enter such injunctive relief "as is necessary to assure full enjoyment of the rights granted by [the Act]." [12] *Id.* at 434.

---

**8.** See footnote 5, *supra,* concerning the status of the ACA at this point in time.

**9.** The appellate decision did not bother noting that this "plain error" derived from a case that was not decided by the Court of Appeals until months after the trial of this action.

**10.** This Court's decision had made extensive factual findings. *See United States v. Village of Airmont,* 839 F.Supp. 1054 (S.D.N.Y.1993). The appellate decision did not dispute any of these specific findings but instead superimposed its view of the jury's findings so as to render them immaterial.

**11.** However, some individuals did make such attempts, albeit unsuccessfully, by monitoring the number of persons attending services.

**12.** No citation of authorities for this proposition—*i.e.* where no action has been taken or is imminently threatened—is set forth by the Court of Appeals, other than the language of the Act itself.

### The Government's Request For Injunctive Relief

■ The Court of Appeals decision authorizes relief to parties who "will be injured by a discriminatory housing practice that is about to occur," citing 42 U.S.C. § 3602(i). *Id.* at 425. In light of that Court's interpretation of the jury's verdict, as applied in the government's case, the government has understandably focused its request for injunctive relief on the zoning code. However, rather than requesting prohibitory injunctive relief against illegal or unconstitutional applications of the code, the government has sought to redraft the zoning code in an affirmative manner. In its memorandum in support of its request, the government argues that "[t]aken together, these changes will help ensure that the Village will permit the use of residences for regular religious worship and that it will otherwise respect the rights of Orthodox and Hasidic Jews to live and pray in Airmont." [13] Government's Memorandum at 11.

The Village notes that the zoning changes requested by the government would allow a home synagogue to operate in virtually every house and could completely eviscerate its zoning code. That may well be. The Second Circuit opinion appears incompatible with the decision of the Eleventh Circuit in *Grosz v. City of Miami Beach, Florida,* 721 F.2d 729, 741 (1983), *cert. denied,* 469 U.S. 827, 105 S.Ct. 108, 83 L.Ed.2d 52 (1984), and the decision of the Sixth Circuit in *Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood, Ohio,* 699 F.2d 303, *cert. denied,* 464 U.S. 815, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983). In addition, it would appear to contradict an earlier decision in this District which also concerned Ramapo. *Congregation Beth Yitzchok of Rockland, Inc. v. Town of Ramapo,* 593 F.Supp. 655 (S.D.N.Y.1984). However, while we may disagree with the ruling of the Circuit Court, we are compelled to follow its directions.

Since the Village has done nothing except pass a zoning code which has never been enforced or interpreted, and there are no actions to overturn, it would seem that there is no other way of satisfying the remand directions except by revising the existing zoning code. [14] Consequently, we accept in general the government's approach to amending the zoning code as being the only practical way of complying with the remand order. [15] We will, therefore, in a separate order and judgment, enjoin the Village and its officers, employees, agents, successors, and assigns from promoting religious discrimination; from denying equal opportunity to religion by use, interpretation, or enforcement of the zoning code in such a manner that it prevents home worship; from discriminating because of religion or interfering with

13. The government's changes in the zoning code are obviously intended to assist only Orthodox Jews and not other smaller religions that conduct home services, which is a questionable favoring of one religion. However, that conforms to the Court of Appeals' conclusion that the need for home places of worship is "unique to the Orthodox and Hasidic Jews." *Id.* at 430–31. (The Court of Appeals reached this conclusion on the debatable basis that Orthodox and Hasidic Jews were the only ones who had applied to conduct services under Ramapo's home professional office provisions.) There was, however, evidence at trial of other small non-Jewish religious groups which held home services.

14. Any attempt to enforce the code in violation of the Fair Housing Act or constitutional rights would, of course, be illegal even without injunctive relief. However, as the government argues, a preventive injunction can be enforced by contempt sanctions without the necessity of instituting new litigation.

15. We do this despite the Supreme Court's teaching in *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), that, in light of considerations of federalism, "[w]here ... the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'" *Id.* at 378, 96 S.Ct. at 607, *citing Stefanelli v. Minard,* 342 U.S. 117, 120, 72 S.Ct. 118, 120, 96 L.Ed. 138 (1951). We also ignore the more recent Supreme Court directive that equitable relief must be remedial in nature, *i.e.* it must be designed to restore as nearly as possible the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct. *Missouri v. Jenkins,* —— U.S. ——, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995). We do not see the relief requested as improving in any way the rights already exercised by the Orthodox in Airmont. The relief simply is insurance that there can be no challenges to their exercise of religion in their homes in the future.

the free exercise of religion in connection with housing; and from taking any action that limits the availability of housing on the basis of religion. Specifically, we will direct a revision of the zoning code so that it will not be construed to prevent home worship, or to prevent persons from walking to and from religious services at such places of worship, or to prevent home worship services on any day in all residential zones. In addition, the phrase "place of worship" will be replaced with "free-standing place of worship" throughout the zoning code and will be redefined so as to allow a portion of the building to be dedicated as living quarters for clergy and their families; and the phrase "neighborhood place of worship" will be added and will refer to larger structures used exclusively for the conducting of organized religious services, which will be permitted in all residential zones. In addition, as requested, we will order that the last two sentences of the definition of "Home Professional Office" be deleted.[16]

The government also requests that the Village be directed to retain applications for residential homes of worship for five years. In light of the changes made in the zoning code, we do not foresee the need for zoning applications. The government also requests that for five years the Village notify the government of any zoning and planning applications which relate to religious worship or changes in the zoning relating to religion. While we deem it highly unlikely, under the circumstances, that the Village would entertain anything relating to religion under the zoning laws, we see no harm in including that in the relief granted.

### Private Plaintiffs' Requests

■ The private plaintiffs' main request for injunctive relief is a major one: they seek the dissolution of the Village. They argue that they have proved that the defendants have engaged in a pattern or practice of discrimination and that discriminatory intent was at the root of the incorporation of the

Village and consequently, they maintain, they are entitled to this remedy.

There are several fallacies to this argument. In the first place, there has been no finding of religious discrimination with respect to the incorporation of the Village of Airmont. Indeed, the jury found that the majority of voters who supported the incorporation of the Village were not involved in religious discrimination. Moreover, the appellate decision remanding the action focuses upon the change in the zoning code as to which no action has ever been taken. There is nothing in the Court of Appeals' decision even remotely suggesting that the Village must be dissolved. The Second Circuit has held, in *Dean v. Coughlin*, 804 F.2d 207, 213 (1986), that we should not use a sledgehammer where a more delicate instrument will suffice. We believe that the relief requested by the government and granted by this Court adequately meets the Second Circuit's concerns expressed in their decision.

Another problem with the private plaintiffs' request is that it has no support in either the statute or case law. The private plaintiffs rely on *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). That case was virtually the converse of the present situation. The state legislature in Alabama had revised the boundaries of the City of Tuskegee so as to eliminate the famous black Tuskegee Institute which included most of the black residents of the City. The Supreme Court reversed this action, finding that it was contrary to the Fifteenth Amendment by depriving blacks of their right to vote on account of their race.

■ Curiously, the private plaintiffs ask, alternatively, for relief similar to what the Supreme Court condemned in *Gomillion*. They seek a plan to redistrict the Orthodox "who reside in some localized area of Airmont" back into the Town of Ramapo. We doubt that we could adequately ascertain what the localized area would be. (The six-

16. We do not wish to imply that we have any agreement whatever with the Ramapo approach to home places of worship. While construing these as professional offices might have been a satisfactory political solution to a difficult question, it is intellectually dishonest to categorize

services involving up to fifty people as being an activity of a home professional office such as might be conducted by a doctor, lawyer or religious leader who simply consulted with a couple of members of his congregation.

lane New York Thruway forms a natural boundary between Ramapo and Airmont.) Moreover, the Orthodox population in Airmont has *increased* since the formation of the Village. That relief also seems both contrary to the directions of the Court of Appeals and of doubtful legality in its own right. The Supreme Court recently ruled that the government may not establish boundaries according to religion. *Board of Education of Kiryas Joel Village School District v. Grumet,* —— U.S. ——, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994). As the Second Circuit has held, the purpose of the Fair Housing Act is to promote integration, not to encourage segregation. *Otero v. New York City Housing Authority,* 484 F.2d 1122 (1973). Finally, the local government law of New York has provisions for alteration of municipality lines, incorporation or unincorporation of local villages. To the extent that a discreet area of Airmont could be described, we know of no inhibition on that area's holding a referendum to remove itself from the Village of Airmont.

The private plaintiffs also request relief similar to that requested by the government. (Indeed they join in all of the government's requests.) The remand instructed this Court that it "should consider ... whether injunctive relief may also be appropriate." *LeBlanc–Sternberg,* 67 F.3d at 432. While we question whether the private plaintiffs, whose rights have long been vested, require any injunctive relief at all, that which has been granted in the government's action will more than suffice. We believe that, to the extent that their requests are justified, they have been adequately encompassed by granting the government's requests.[17]

### DECLARATORY JUDGMENT AND NOMINAL DAMAGES

■ While the Village disputes the need for declaratory relief, the Court of Appeals remanded the action for a declaration that the Village violated the Fair Housing Act. Consequently, we have no alternative except to so declare. The action was also remanded for purposes of granting nominal damages to the private plaintiffs. The remand does not indicate in what amount the nominal damages should be, but the traditional amount has been $1.00. Consequently, we award each of the private plaintiffs nominal damages in the amount of $1.00.

### ATTORNEYS' FEES

The remand decision in this case did not mention attorneys' fees. The private plaintiffs, however, request the Court to set a schedule for them to make an application for attorneys' fees as the prevailing parties in this action. We question whether the private plaintiffs are truly *the* prevailing party in the private action. They lost to the five individual defendants who are clearly prevailing parties. Moreover, to the extent that the private plaintiffs are the prevailing party against the Village, they have not prevailed on their major goals of recovering substantial monetary damages and having the Village dissolved. While the Supreme Court and the Second Circuit have been taking dramatically different approaches to the need for attorneys' fees to be proportionate to the success obtained, the Supreme Court has held that a plaintiff who obtains only nominal damages when suing for a much larger sum is usually not entitled to attorneys' fees, even though he technically qualifies as a prevailing party. *Farrar v. Hobby,* 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992); *but see Cabrera v. Jakabovitz,* 24 F.3d 372, 393 (2d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 205, 130 L.Ed.2d 135 (1994).

There is a practical reason for not awarding the private plaintiffs attorneys' fees here. Two of the prevailing defendants have an application pending for attorneys' fees.[18] If we direct the Village to pay attorneys' fees of the plaintiffs and the plaintiffs to pay the

---

**17.** At times in dealing with the private plaintiffs' action in its opinion, the Second Circuit acts as if they were pursuing a class action. They were not. They were seeking money damages and the abolition of the Village on their own. Another Orthodox group, as mentioned above, has pending its own separate action.

**18.** This application was argued some time ago. However, after the appeal was filed and the appellate panel selected, this Court thought it prudent not to act upon their application at that time.

attorneys' fees of the two individual defendants, what we have will amount to directing the Village to pay the attorneys' fees of the individual defendants.[19]

We do not, however, rule on this matter at this time since no application for attorneys' fees as such has been made, rather a request that we set up a "schedule." The private plaintiffs' counsel are free to make any application which is timely, under the rules and the case law. The issue will be decided at that time.

**SO ORDERED.**

---

**19.** This, in fact, is a relief which two of the individual defendants, who were separately represented in this action, sought to obtain in the first place.