Rabbi Yitzchok **LEBLANC–STERNBERG, Chanie Leblanc–Sternberg, Fred Walfish, Lewis Kamman, Park Avenue Synagogue, Inc., Plaintiffs,**

v.

Robert **FLETCHER, Nick Vertullo, Raymond Kane, Maureen Kendrick, and John C. Layne, Individually and in their capacity as Trustees of the Village of Airmont, and The Village of Airmont, Defendants.**

No. 91 Civ. 2550(GLG).

United States District Court, S.D. New York.

July 1, 1998.

Reuben S. Koolyk, Arnold & Porter, New York City, Kevin W. Goering, Coudert Brothers, New York City, Craig L. Parshall, Law Offices of Craig Parshall, Fredericksburg, VA, Joseph Paul Secola, Rutherford Institute of Connecticut, N. Milford, CT, Sara L. Shudofsky, U.S. Attorney's Office for Southern District of New York, New York City, for Plaintiffs.

Burton I. Dorfman, Dennis E. A. Lynch, Dorfman, Lynch & Knoebel, Nyack, NY, Brian S. Sokoloff, Thurm & Heller, LLP, New York City, Charles A. Bradley, Edmund C. Grainger, III, McCullough, Goldberger & Staudt, White Plains, NY, for Defendants.

## *OPINION*

GOETTEL, District Judge.

The Court of Appeals has reversed and remanded this Court's Memorandum Decision of October 15, 1996, concluding "that the district judge's decision was based on clear errors of both fact and law."[1] *LeBlanc–Sternberg v. Fletcher*, 143 F.3d 748, 757 (2d Cir.1998). The case was remanded for a calculation of a reasonable fee to be awarded to the plaintiffs "in light of their substantial victory against the Village," *id.* at 763, despite the fact that the plaintiffs were completely unsuccessful as to most of the defendants and received neither compensatory nor punitive damages against any defendant.

With respect to the claimed expenses, the decision requires that this Court "articulate which expenses, if any, it deems not reimbursable." *Id.* The appellate decision holds that a plaintiff is entitled to a fee award if he succeeded on any significant issue. *Id.* at 758–59. The Court of Appeals found that the injunctive relief granted the plaintiffs in this case was, in fact, significant. *Id.* at 759–60. The decision then held that, "[w]hen a plaintiff has achieved substantial success in the litigation but has prevailed on fewer than all of his claims, the most important question in

---

1. As best I can determine from the Court of Appeals' lengthy opinion, the only purported error of law was this Court's belief that the amount of attorney's fees awarded should bear some relationship to the value of the judgment obtained and not simply be a lodestar award for time spent. This Court followed the Supreme Court's decision in *Farrar v. Hobby*, 506 U.S. 103, 115, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), which held that "[i]n a civil rights suit for damages," a fee award will rarely be justified when a plaintiff "fail[s] to prove an essential element of his claim for monetary relief," but receives only a nominal one dollar award. The Second Circuit's jurisprudence, both before and after *Farrar*, has been opposed to requiring proportionality between the fees awarded and the damages obtained, resulting in fee awards several times the damages awarded to plaintiff. *See, e.g., Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir.1994); *Cowan v. Prudential Ins. Co. of America*, 935 F.2d 522, 525–28 (2d Cir.1991). According to the *National Law Journal* of June 22, 1998, this very issue was presented to the Second Circuit for *en banc* review in *Quaratino v. Tiffany & Co.*, 129 F.3d 702 (2d Cir.1997), *reh'g en banc granted* (argued June 10, 1998).

determining a reasonable fee is whether the failed claim was intertwined with the claims on which he succeeded." *Id.* at 761–62. The Court of Appeals went one step further and found that the claims on which the plaintiffs succeeded were, in fact, based on the same core facts and law as most of the failed claims, and, therefore, "there should be a fee award for all time reasonably expended."[2] *Id.* at 761–63.

The legal fees sought, including costs[3] and fees incurred in connection with this most recent appeal, are approaching two million dollars. The defendant responsible for paying these sums is the small Village of Airmont. A fee and cost award in the amount obviously contemplated by the Court of Appeals could possibly bankrupt the Village.[4]

This Court notes that, as appellate decisions are fond of saying when an issue may be determined based solely on the record, *see, e.g., Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.,* 885 F.2d 1, 7 (2d Cir. 1989), *cert. denied,* 494 U.S. 1029, 110 S.Ct. 1477, 108 L.Ed.2d 614 (1990); *Chris–Craft Indus., Inc. v. Piper Aircraft Corp.,* 516 F.2d 172, 186–87 (2d Cir.1975), *rev'd on other grounds,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d

124 (1977), the Court of Appeals was in as good a position as the District Court to make these determinations. Instead, however, the Court of Appeals chose to remand this matter to this Court. Since I decline, respectfully, to follow the directions of the Court of Appeals, I feel compelled to explain my position in some detail. Although this case has been the subject of a number of decisions,[5] the decision of October 15, 1996, which was reversed, was not published and, consequently, it is necessary to repeat many of the facts set forth therein.[6]

### THE PRIOR PROCEEDINGS

Plaintiffs, who are Orthodox and Hasidic Jews, originally sued twenty-one defendants, asserting claims of religious discrimination with respect to the adoption of zoning ordinances restricting the operation of home synagogues in residential areas, dilution of their voting power, and the discriminatory treatment of Orthodox Jews in the area which had just become the Village of Airmont, pursuant to 42 U.S.C. §§ 1983, 1985(3), and the Federal Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.* The predominant relief sought was

2. The decision does note two minor claims which it acknowledges were not related to the successful claims. *LeBlanc–Sternberg,* 143 F.3d at 762–63. However, the decision cautioned that, if there were excluded hours, this Court "must state its reasons for doing so as specifically as possible ... in order to permit adequate appellate review." *Id.* at 764 (citing *Orchano v. Advanced Recovery, Inc.,* 107 F.3d 94, 99 (2d Cir. 1997) (quoting *DiFilippo v. Morizio,* 759 F.2d 231, 234 (2d Cir.1985))).

3. The costs claimed by the plaintiffs include not only those incurred by their attorneys but also nearly $11,000 in costs incurred by the plaintiffs themselves.

4. The Village has been represented by an attorney furnished by an insurance carrier, but it is my understanding that this was done under a reservation of rights, and there is no certainty that the insurance carrier will pay a fee award to the plaintiffs.

5. *Leblanc–Sternberg v. Fletcher,* 763 F.Supp. 1246 (S.D.N.Y.1991); *LeBlanc–Sternberg v. Fletcher,* 781 F.Supp. 261 (S.D.N.Y.1991); *United States v. Village of Airmont,* 839 F.Supp. 1054 (S.D.N.Y.1993); *LeBlanc–Sternberg v. Fletcher,*

846 F.Supp. 294 (S.D.N.Y.1994); *LeBlanc–Sternberg v. Fletcher,* 922 F.Supp. 959 (S.D.N.Y.1996); *United States v. Village of Airmont,* 925 F.Supp. 160 (S.D.N.Y.1996); *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412 (2d Cir.1995), *cert. denied,* 518 U.S. 1017, 116 S.Ct. 2546, 135 L.Ed.2d 1067 (1996); *LeBlanc–Sternberg v. Fletcher,* No. 96–6149, 104 F.3d 355, 1996 WL 699648 (2d Cir. Dec.6, 1996) (unpublished table decision), *cert. denied,* —— U.S. ——, 117 S.Ct. 2431, 138 L.Ed.2d 193 (1997); *LeBlanc–Sternberg v. Fletcher,* 143 F.3d 748 (2d Cir.1998); *LeBlanc–Sternberg v. Fletcher,* 143 F.3d 765 (2d Cir.1998).

6. This Court's decision of October 15, 1996 not only denied the plaintiffs' claim for fees and costs but also denied the claims for fees and costs of counsel for some of the defendants who were clearly prevailing parties. *LeBlanc–Sternberg v. Fletcher,* Civ. No. 91–2550, slip op. at 11 (D.Conn. Oct. 15, 1996) (Document #268). Defendants likewise appealed. In dealing with that appeal, the Second Circuit decided to issue a separate opinion, affirming this Court's failure to award attorney's fees to a prevailing defendant. *LeBlanc–Sternberg v. Fletcher,* 143 F.3d 765 (2d Cir.1998). By dealing with these issues separately, the Court minimized the obvious preference given to plaintiffs' claims over defendants' claims for attorneys' fees.

damages and the disestablishment of the newly formed Village of Airmont.

The claims against most of the original defendants were either withdrawn or dismissed by this Court on motion. The case ultimately went to trial against five defendants individually and in their capacity as Trustees of the Village of Airmont and against the Village itself. The trial lasted seven weeks. The jury deliberations took a full week, an extraordinarily long time for deliberations in a civil case.

The case was submitted to the jury on a special verdict form containing a number of interrogatories. The jury found that none of the individual defendants, either in their individual capacity or as Trustees of the Village, had violated plaintiffs' civil rights or their rights under the Fair Housing Act. The jury further found that they had not conspired with anyone to do so. The jury found that the voters who favored incorporation of the Village were not motivated even in part by discrimination against Hasidic or Orthodox Jews. The jury also specifically found that the Village did not undertake any action to intentionally deprive the plaintiffs of the right to enjoy the full and equal benefit of all laws and the use of their property because they were Orthodox or Hasidic Jews. The jury did find, however, that the Village had violated the private plaintiffs' fair housing rights and had conspired to violate their rights to the free exercise of religion and speech. The jury, nevertheless, did not award any damages against the Village, not even nominal damages, although they were instructed that they could. In all, the jury rendered twenty-three findings in favor of the defendants and only the two mentioned earlier in favor of the plaintiffs.

The private action had been consolidated for trial with an action filed several months later by the U.S. Government against the Village and its then-Trustees (some had changed) under the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*, seeking declaratory and injunctive relief. The Government's action, as required by law, was decided by the Court. After hearing all of the evidence, this Court ruled in favor of the Village, finding that it had done nothing to interfere with the

religious practices or fair housing rights of Orthodox Jews. *See United States v. Village of Airmont,* 839 F.Supp. 1054, 1064 (S.D.N.Y. 1993), *rev'd,* 67 F.3d 412 (2d Cir.1995), *cert. denied,* 518 U.S. 1017, 116 S.Ct. 2546, 135 L.Ed.2d 1067 (1996). (Indeed, the Village had only begun operation two days before the private plaintiffs' action was filed and a half year before the Government's action).

In addition to finding for the defendants in the Government's action, this Court set aside the two jury findings against the Village in the private plaintiffs' action, pursuant to Rule 50(b), Fed.R.Civ.P. *LeBlanc–Sternberg v. Fletcher,* 846 F.Supp. 294, 295 (S.D.N.Y. 1994), *rev'd,* 67 F.3d 412 (2d Cir.1995), *cert. denied,* 518 U.S. 1017, 116 S.Ct. 2546, 135 L.Ed.2d 1067 (1996). This Court held that, while certain questionable statements may have been made by the individual defendants, the Village *qua* Village had done nothing to discriminate against the plaintiffs. This Court emphasized the inconsistencies inherent in the jury's responses to the interrogatories on the special verdict form. *Id.* at 295–96. Accordingly, in granting judgment as a matter of law, this Court held that there was only one conclusion that reasonable persons could reach as to the liability of the Village, in light of the jury's findings as to the individual defendants: *no case had been proven.* Plaintiffs in both actions appealed.

The Court of Appeals reversed, starting with the Court's entry of judgment on behalf of the Village in the private plaintiffs' case. *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 424–33 (2d Cir.1995) (*"LeBlanc–Sternberg I "*), *cert. denied,* 518 U.S. 1017, 116 S.Ct. 2546, 135 L.Ed.2d 1067 (1996). The Court of Appeals attempted to harmonize the jury's responses by surmising that the jury was persuaded that the enactment of the Airmont Zoning Code in late 1992 was intended to limit home synagogues in residential areas, and violated the Fair Housing Act. *Id.* at 428. It concluded that this finding was "implicit" in the jury's verdict, *id.* at 430, which it found to be "consistent and fully supportable." *Id.* at 429. It then held that this "implicit" jury verdict collaterally estopped this Court from finding against the Government in the nonjury action, because the jury's findings on

the private plaintiffs' Fair Housing Act claims against the Village "necessarily determined all of the liability issues" in the Government's Fair Housing Act claim against the Village.[7] *Id.* at 434. (That action would not seem to have been of any consequence for the plaintiffs in this case, since they had already obtained permission to conduct religious services in their homes). Amazingly, however, the Court of Appeals later used the Government's success as a basis for finding that these private plaintiffs had obtained a substantial victory. *LeBlanc–Sternberg,* 143 F.3d at 759–60.

The Zoning Code, which the Court of Appeals found to be the basis for the jury's verdict, was not passed until almost two years *after* the private plaintiffs' action had been commenced. The Code had never been enforced nor interpreted as of the time of the jury's verdict. Neither the private plaintiffs nor the Government amended their complaints to make any claims concerning the Zoning Code. While the Zoning Code was of some consequence in the Government's Fair Housing Act case, it had little relevance to the private plaintiffs' suit, since they had earlier, through application to the Town of Ramapo Zoning Board and by prevailing in the litigation, established their right to conduct services in a home synagogue.

On remand, at the Government's request, and upon the appellate court's direction, injunctive relief was granted with respect to the Zoning Code and its future application. *United States v. Village of Airmont,* 925 F.Supp. 160, 161 (S.D.N.Y.), *aff'd,* 104 F.3d 355 (2d Cir.1996) (unpublished table decision), *cert. denied,* —— U.S. ——, 117 S.Ct. 2431, 138 L.Ed.2d 193 (1997). The private plaintiffs, however, received only nominal damages of one dollar per plaintiff and re-

ceived no injunctive relief except to the extent that the Government's request was granted. *LeBlanc–Sternberg v. Fletcher,* 922 F.Supp. 959, 965–66 (S.D.N.Y.1996). The Court of Appeals affirmed this result. *LeBlanc–Sternberg v. Fletcher,* No. 96–6149, 104 F.3d 355, 1996 WL 699648 (2d Cir. Dec.6, 1996) (unpublished table decision), *cert. denied,* —— U.S. ——, 117 S.Ct. 2431, 138 L.Ed.2d 193 (1997).

Attorneys for all of the parties then filed requests for attorneys' fees.[8] The requests from plaintiffs' counsel, for services rendered by large New York and Washington, D.C., law firms and by the Rutherford Institute, were by far the largest.[9] In the Government's suit, no attorneys' fees were sought. However, the time involved in the consolidated trial of the Government's case necessarily increased substantially the hours spent by the attorneys for the private plaintiffs, since the Government's case was broader in scope than that of the private plaintiffs.

### FINDINGS OF FACT

In declining to award attorneys' fees, this Court made a number of findings of fact. In its recent appellate opinion, the Court of Appeals reversed those findings, making its own findings. My disagreement with the Court of Appeals arises from its findings in three significant areas, which I will now discuss in detail.

### I. Did the Plaintiffs Win a Significant Jury Verdict?

The Court of Appeals found that the plaintiffs won a very significant jury verdict. *LeBlanc–Sternberg,* 143 F.3d at 759–60. They did not. The verdict that was returned was both inconsistent and of no value standing

---

7. The invocation of collateral estoppel in joint jury and bench trials had been espoused earlier by the author of the reversing decision in the instant case in *Wade v. Orange County Sheriff's Office,* 844 F.2d 951, 954 (2d Cir.1988). The effect of that approach is to severely limit the trial court's ability to conduct a bench trial in conjunction with a jury trial, since the bench trial has become subject to a jury's verdict. *See Sas v. Trintex,* 709 F.Supp. 455, 456 (S.D.N.Y. 1989).

8. Certain of the successful Trustees did not seek fees. An application for fees was also made by the Town of Ramapo and its supervisor, who had been dismissed from the case long before trial. That application was denied.

9. The case was tried by an attorney from the Rutherford Institute and an associate from one of the law firms. Nevertheless, a large number of attorneys claim to have spent substantial time on the case, although some of that time related only to the appeal.

alone. The verdict was inconsistent in that the jury returned two findings against the Village, while at the same time finding that none of the individual defendants, who were managing the Village, had performed any of these acts. In addition, although rendering those two findings in favor of the plaintiffs, the jury awarded them no damages whatsoever against the Village.[10]

As noted above, the jury's verdict was handed down after a week of deliberations, which is unusually long for a civil case. I felt then, and continue to believe, that besides its inconsistencies, this was a compromise verdict. (Newspaper interviews with jurors subsequently confirmed that finding).

The appellate panel in this case has never addressed this possibility. The Court seems to believe that a compromise verdict is not legally cognizable, perhaps because the Federal Rules of Civil Procedure do not provide a means for dealing with it. However, other panels of the Second Circuit have discussed the fact that compromise verdicts are returned. *See, e.g., Vichare v. Ambac, Inc.,* 106 F.3d 457, 463–64 (2d Cir.1996); *Diamond D. Enter. USA, Inc. v. Steinsvaag,* 979 F.2d 14, 17 (2d Cir.1992), *cert. denied,* 508 U.S. 951, 113 S.Ct. 2442, 124 L.Ed.2d 660 (1993). As another recent Second Circuit panel held: "We may infer that a verdict is a compromise where damages are awarded in an amount inconsistent with the theory of liability offered at trial together with other indicia such as a close question of liability." *Atkins v. New York City,* 143 F.3d 100, 104 (2d Cir. 1998).

What the Court of Appeals in this case did focus upon was the purportedly extensive injunctive relief obtained by the private plaintiffs pursuant to their theoretical request. As noted earlier, the injunctive relief was granted in an inverse fashion. The Court of Appeals used the two jury findings against the Village to upset all of the findings of fact of this Court in the Government's case (on what this Court mistakenly thought was a bench trial), then directed the invocation of substantial injunctive relief in the Government's action, which it now uses as the basis for saying that the private plaintiffs obtained extensive injunctive relief. In addition, the Court of Appeals sought to overcome the absence of a damage award by concluding that the plaintiffs were really not interested in money but only in injunctive relief.[11]

In rejecting this Court's Rule 50(b), Fed. R.Civ.P., reversal of the two factual findings in favor of the plaintiffs, the appellate decisions (both the subject one and the earlier reversal on liability) cited to various snippets of evidence in the record where certain individual defendants are quoted as making outrageously biased remarks. There was such testimony. However, there was substantially more testimony from the individual defendants as well as from other impartial sources (such as tape recordings of meetings) indicating that these remarks were not made. Moreover, to speculate that the jury's two findings in favor of the plaintiffs resulted from such statements is directly contradicted by the fact that the jury found that the speakers themselves had not conspired to violate the plaintiffs' constitutional rights to the free exercise of religion or free speech, nor had they undertaken any action to deprive plaintiffs of their right to enjoy the full and equal benefit of all laws and the use of real property.

In dealing with the inconsistency in the jury's findings that the Village conspired but

**10.** Subsequently, based upon new Second Circuit precedent, *Cabrera v. Jakabovitz,* 24 F.3d 372, 391 (2d Cir.), *cert. denied,* 513 U.S. 876, 115 S.Ct. 205, 130 L.Ed.2d 135 (1994), and *Gibeau v. Nellis,* 18 F.3d 107, 110–11 (2d Cir.1994), which were decided after the trial of this case, the Court of Appeals found that this Court should have directed the jury that it must award the plaintiffs at least nominal damages, if it found plaintiffs suffered a constitutional violation. Consequently, the judgment in this case was amended to give each of the five plaintiffs a $1.00 award.

**11.** This finding was necessary to circumvent the Supreme Court's holding in *Farrar,* 506 U.S. at 114, 113 S.Ct. 566, that "[w]here recovery of private damages is the purposes of … civil rights litigation," a plaintiff who obtains no more than nominal damages will typically not merit an award of attorneys' fees. *See LeBlanc–Sternberg,* 143 F.3d at 758 (citing *Pino v. Locascio,* 101 F.3d 235 (2d Cir.1996)).

that the individuals who ran the Village did not, the Court of Appeals found that it was "implicit" in the jury's verdict that the jury found that the Village had conspired with the Airmont Civic Association. *LeBlanc–Sternberg I,* 67 F.3d at 430; *LeBlanc–Sternberg,.* 143 F.3d at 759–60 There was no evidence whatsoever to support such a finding. The Civic Association had sought the formation of the Village, which commenced operation only two days before the commencement of the private plaintiffs' suit. It also supported the election of the individual defendants to office. However, no sooner had the Village been formed and the Trustees elected than a falling-out occurred, and the Civic Association became moribund and disbanded.

Neither a Civic Association nor a Village can take action by itself. Either must act through an officer or other agent. *See, e.g., Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d 256, 263 (2d Cir.1995), *cert. denied,* 516 U.S. 1114, 116 S.Ct. 916, 133 L.Ed.2d 846 (1996); *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,* 30 F.3d 339, 344 (2d Cir.1994). Based upon the evidence introduced at trial, the individual defendants (found by the jury to be guiltless) were the only possible actors. Indeed, the remanding decision referred to those individuals as being "those defendants, who governed both members of the conspiracy...." *LeBlanc–Sternberg,* 143 F.3d at 762.

Therefore, I conclude, contrary to the Court of Appeals, that the plaintiffs did not obtain a substantial jury victory—rather they won a technical Court of Appeals' victory based upon a unique use of collateral estoppel and factual findings with which I vigorously disagree.

## II. Were Plaintiffs Primarily Seeking Injunctive Relief or Money Damages?

Throughout the lengthy seven-week trial, it was apparent to anyone present that the private plaintiffs were interested primarily in a money judgment. (The United States Government, of course, was seeking solely injunctive relief). In its most recent decision, the Court of Appeals found that the private plaintiffs were not interested in money damages but were seeking injunctive relief to protect themselves against adverse action which might be taken against them. *Id.* at 761. In their complaint, their amended complaint, and their second amended complaint, the plaintiffs sought monetary damages, punitive damages (against all defendants except the Village from which they could not obtain punitive damages), and attorneys' fees. With respect to injunctive relief, their major goal was and is to have the Village dissolved.[12] They did not obtain that relief. Indeed, this Court granted them no injunctive relief, questioning whether they needed an injunction and finding, in any event, that which had been granted in the Government's action would suffice.[13] *LeBlanc–Sternberg,* 922 F.Supp. at 966.

To support its claim that plaintiffs were not particularly interested in a money judgment but were more concerned with injunctive relief, the recent appellate decision emphasizes certain arguments made by plaintiffs' counsel to the effect that the case was not about money but was about prayer. *LeBlanc–Sternberg,* 143 F.3d at 761. They were clever arguments and appropriate to make to the jury to diminish the monetary concerns that impelled the lawsuit. However, having sat through that trial and having heard some of the bizarre testimony designed to induce damage awards—such as the claim of a female plaintiff that she was infected by a severe virus communicated to her by an unknown official of the Civic Association, and other details concerning the financial difficulties of the plaintiffs' synagogue (they wanted to build a traditional free-standing building)[14]

---

**12.** The second amended complaint sought a permanent injunction restraining all defendants from "pursuing any further proceedings with respect to establishment, functioning and zoning of the Village of Airmont." Pl.'s Second Am. Compl. ¶ 1(b).

**13.** Following the reversal in the Court of Appeals, the private plaintiffs did submit a copycat request for injunctive relief adopting the Government's request.

**14.** The Court of Appeals' decision also cites the testimony of one plaintiff that, if he received a monetary award he would give it to the syna-

—this Court is convinced that the paramount purpose of the private plaintiffs' suit was to obtain money damages. They did not obtain such an award.[15]

### III. Did the Village Take or Threaten Actions Against the Plaintiffs Such That the Injunctive Relief Awarded in this Case Materially Changed their Legal Relationship?

The appellate decision reversing this Court's earlier decision on liability, in the Government's case, directed this Court to issue such injunctive relief as was required. *LeBlanc–Sternberg I,* 67 F.3d at 435. With respect to the private plaintiffs' case, the Court of Appeals remanded it for consideration of what equitable relief was appropriate. *Id.* As noted earlier, this Court did not give the private plaintiffs the injunctive relief which they primarily sought (the dissolution of the Village). This Court considered the relief awarded the Government to be more than adequate to accommodate any concerns that the private plaintiffs might have. My view in that regard was strongly influenced by the fact that, in late 1989, while still part of the Town of Ramapo, the plaintiffs' congregation made application to use the Rabbi's house as a place of worship. This application was ultimately granted more than a year before the Village came into existence. Moreover, as conceded by the plaintiffs, the Village did nothing to interfere with their conducting of religious services thereafter. In its application for injunctive relief, the Government also conceded that it could not point to any significant action taken by the defendants against the plaintiffs or other Orthodox Jewish groups.[16] However, the Government argued that an injunction should issue to prevent a future wrong although no right had yet been violated. The Court of Appeals apparently agreed with this approach, finding that the injunction against the Zoning Code removed a "threatened" discrimination against the plaintiffs. *Le-Blanc–Sternberg,* 143 F.3d at 758–59.

Even if the Zoning Code is interpreted some day as to prohibit the operation of synagogues in private homes in residential areas, it would have no effect on these plaintiffs, whose synagogue would, at worst, be considered a nonconforming use. While the Court of Appeals found that there was a "substantial threat of such interference," *id.,* and that an injunction was necessary to remove this threat, this Court saw no evidence of such a threat as it pertains to these plaintiffs.[17] This Court previously found as a matter of fact, and continues to strongly believe, that the judgment entered in this case did not materially change the legal relationship between the private plaintiffs and the Village.

### CONCLUSION

These are the major factual disagreements in this case between this Court and the Court of Appeals. When an appellate panel wishes to reach a certain conclusion, there is nothing that the trial judge can do to stop it. He is bound by their legal conclusions even though he vigorously disagrees with them and they are subsequently proven wrong. *See, e.g., Santopietro v. United States,* Civ. Nos. 3:96–957, 3:96–1175(GLG) (D.Conn. Sept. 12, 1996) (unpublished decisions on bail application) (Doc. Nos. 3 and 5, respectively), and *Santo-*

gogue, as showing that the plaintiffs were not interested in money. To the contrary, it shows that they were interested in money, not for themselves, but for their synagogue.

15. The Court of Appeals further found that a clerical error had been made in not annexing to the judgment for these plaintiffs the injunctive relief set forth in the order and judgment in the Government's case. *LeBlanc–Sternberg,* 143 F.3d at 764. We do not believe that Rule 65(d), Fed.R.Civ.P., required attaching that document to the plaintiffs' judgment since it serves no purpose other than to support the Court of Appeals' conclusion that the plaintiffs obtained a substantial verdict. However, we have no option in that regard. We will direct the Clerk to append a copy of the Government's judgment to the judgment for the private plaintiffs.

16. The Government's action was not solely concerned with the plaintiffs' situation but encompassed other Orthodox groups in the Village as well.

17. *LeBlanc–Sternberg I* found "ample support for the jury's *implicit* finding that Airmont's Zoning Code would be interpreted to restrict the use of home synagogues ...." 67 F.3d at 431 (emphasis added).

*pietro v. United States,* 948 F.Supp. 145 (D.Conn.1996) (overturning a conviction based upon a statute held unconstitutional by the Second Circuit in *United States v. Foley,* 73 F.3d 484 (2d Cir.1996), which statute was subsequently upheld by the Supreme Court in *Salinas v. United States,* —— U.S. ——, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997)). Moreover, the trial court must adhere to the factual findings of the Court of Appeals, even though this was the province of the trial court. *See* Gerard L. Goettel, *From the Bench: Appellate Factfinding—and Other Atrocities,* 13 Litigation Mag. 7 (1986). The present situation goes one step beyond that.

Consider if Galileo, having been forced to recant before the Inquisition, upon threat of execution, his "heretical" view that the earth revolved around the sun, was then told to compute the speed of the sun in its revolutions around the earth.[18] I cannot do it. And if I were to try to do it, I would return findings which very likely would be unsatisfactory to the Court of Appeals resulting in yet another reversal, this time with instructions that the case be reassigned.[19] Consequently, I am sending a copy of this decision to the Chief Judge of the Southern District of New York[20] so that he can attempt to find another Judge whose compliance with the Court of Appeals' directives will not be compromised by his knowledge of the facts.

---

18. Galileo Galilei was convinced that the Copernican heliocentric theory, that the earth revolved around the sun, was correct. He was ordered by the Holy Office of the Roman Catholic Inquisition to refrain from publishing evidence of his scientific observations, which were contrary to Scriptural writings that the earth was the center of the universe. Nevertheless, Galileo continued to discuss his observations and, in 1633, at the age of 70, he was convicted by the Roman Inquisition of heresy. In order to escape torture, he chose to publicly recant his views. He was forced to lie down in front of the church where the worshippers could step on him. Yet, immediately following his recantation, he is alleged to have whispered under his breath, *"E pur si muove!"* ("But it does move!"). Abbe Irailh, 3 *Querelles Litteratres* 49 (1761); *see* Will & Ariel Durant, *The Age of Reason Begins, The Story of Civilization,* Part VII, at 601–11 (1961).

19. I am not aware of any authority for such direction but this has not prevented the Court of Appeals from making such directions in the past. *See Sobel v. Yeshiva Univ.,* 839 F.2d 18, 36 (2d Cir.1988), *cert. denied,* 490 U.S. 1105, 109 S.Ct. 3154, 104 L.Ed.2d 1018 (1989); *United States v. Londono,* 100 F.3d 236, 243 (2d Cir.1996); *Pescatore v. Pan Am. World Airways, Inc.,* 97 F.3d 1, 21 (2d Cir.1996). *See generally,* Jack B. Weinstein, *The Limited Power of the Federal Courts of Appeals to Order a Case Reassigned to Another District Judge,* 120 F.R.D. 267 (1988).

20. I am no longer sitting in the Southern District of New York but rather am, and have been for several years, sitting in the District of Connecticut by designation.